EXHIBIT 1



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| BRITANI POTTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. |
| vs. | ) | 2:25-CV-02743-JAR-GEB |
| | ) | |
| STATE OF KANSAS, | ) | |
| | ) | |
| Defendant. | ) | |

VIDEO-RECORDED DEPOSITION OF BRITANI POTTER

TAKEN ON BEHALF OF THE DEFENDANT

JUNE 16, 2026

Page 10

there's -- sometimes they'll add a little. Like on Mondays or, I don't know, a busy day, I think it's $20 more.
Q. Okay. And have you maintained your records on your compensation there?
A. Yes.
Q. How long have you been employed with ESI?
A. Since 2018, or possibly the beginning of 2019.
Q. And so tell me about your -- has the type of work you've done for them remained steady over the course of time?
A. No. When I was employed full-time with the State of Kansas, I rarely had time to substitute. It was supposed to be something I could do on my day off, my flex day, but I rarely actually took my flex day because the demands of my primary job.
Q. In what states are you a member of the bar?
A. Kansas and Arizona.
Q. And how long have you been a member of the bar in Kansas?
A. All of 2022.
Q. And how long have you been a member of the bar in Arizona?
A. I don't recall exactly when. The process

Page 11

took almost a year, so it was probably 2024.
Q. And in terms of becoming a member of the bar in Arizona, did you do that through bar exam or were you able to motion in?
A. I did the uniform bar exam score transfer, whatever it's called.
Q. Okay. And at any point, have you sought employment as a lawyer in Arizona?
A. No.
Q. And is there a reason you have not sought employment as a lawyer in Arizona?
A. Not a specific reason, no.
Q. And at any point in time after August of 2025, have you sought employment as a lawyer in Kansas?
A. No.
Q. In preparation for today's deposition, have you reviewed any documents?
A. No.
Q. So I'm going to go back and talk about your experience with the Kansas State Board of Healing Arts. I understand that you became a law clerk there in 2021; is that correct?
A. Yes.
Q. Tell me how you came about that position.

Page 12

A. It was posted at the P.D.O. or through our -- the Washburn law school's, you know, program for getting jobs for law students.
Q. And how did you -- did you interview for that position with somebody?
A. I did.
Q. With whom did you interview?
A. Nancy Dodik, Katie Bailey, and Todd Hiatt were in the interview.
Q. And what was the role of a law clerk in the Kansas -- with the Kansas State Board of Healing Arts?
A. It was a little vague, because that department had not historically had a law clerk. And so we all just were going into it with, "We'll have to kind of see and develop it."
Q. And how did it develop?
A. I would just be tasked with various legal questions or legal research things as they popped up, or document review, a lot of renewal complaint review. There's consistently been a significant backlog at the Board of Healing Arts in work, and I believe even in the interview, it would have been Todd Hiatt that made a comment to the -- "There's plenty of work to go around, and we'll keep you busy."
So it was various things.

Page 13

Q. And when you came there, who did you report to when you were a law clerk?
A. Officially, Nancy Dodik would approve my timecards, but it was a joint thing between her and Katie Bailey in terms of giving direction or overseeing anything I did.
Q. And what was Nancy Dodik's role?
A. She was the disciplinary counsel, so the head of the disciplinary department.
Q. And Katie Bailey?
A. Was the deputy disciplinary counsel. So second.
Q. And was all of your work as a law clerk on the -- as I understand the Kansas State Board of Healing Arts, and correct me if I'm wrong, lawyers can fit within the disciplinary department, the litigation department, or the general counsel department.
Is that consistent with your understanding?
A. Those three departments do employ attorneys.
Q. And you were, as a law clerk, assigned primarily to the disciplinary department; is that correct?
A. Correct.
Q. And did you, as a law clerk --

Page 14

understanding that law clerks sometimes float around a little bit, did you do any work in the litigation department?

A. No, they had their own.

Q. So the litigation department had its own law clerk?

A. Yep.

Q. And did you do any work in the general counsel department?

A. No. They also had their own, and there's a screen between general counsel and the other two departments.

Q. And how did that screen work?

A. That -- I'm not qualified to speak to that.

Q. In terms of -- you ultimately came to be employed full-time by the Kansas State Board of Healing Arts; is that correct?

A. I did.

Q. And tell me about the process of applying for and being offered that position.

A. There wasn't one. The decision-makers ultimately, after years of requests, were finally granted an additional attorney position for our department. And I had already indicated that I would be interested and had already proven my value to the

Page 15

department, so I was just asked if I was still interested.

Q. So did this happen while you were still a law clerk, or after you completed your law clerk position?

A. I was staying on as a law clerk, pending my bar results.

Q. And who made that offer to you?

A. Officially, it would have been Sheila Rice, the HR person at the time.

Q. And was there an attorney who was primarily responsible for telling you that you'd be able to stay on?

A. I guess that would be Nancy, the head of department.

Q. Okay. And when you started -- and I understand you started your full-time employment on October 3, 2022.

Does that sound right?

A. Yes.

Q. And what was -- once you became employed within the disciplinary department, what -- tell me about your role. Did it change from when you were a law clerk to when you became an attorney?

A. Somewhat. I had -- I was able to act with

Page 16

less direct oversight. Though I was -- I did have the -- they've changed it. It was, like, the 719 student level thing as a law clerk. Now I think it's a different number.

But anyway, so I was -- I had the student licensure. But now that I was fully licensed, once I was trained, then I had a lot more autonomy than I did when I was a law clerk.

Q. Okay. And to whom did you report?

A. Nancy Dodik.

Q. And did she -- to whom did she report?

A. Susan Gile.

Q. In terms of -- there's another name, Tammie Mundil. Who was Tammie Mundil?

A. She was the deputy disciplinary counsel until Nancy left the agency, and then she was given the disciplinary counsel position.

Q. And when did Nancy leave the agency?

A. June of 2025.

Q. I'm going to skip ahead for a few moments. We're going to bounce timelines here. We will not follow things chronologically, so I'm going to skip ahead to August 8 of 2025. That's the date of an executive session, and that's the date that certain actions took place that result, at least in part, as

Page 17

to why you're here today; is that correct?

A. I'm going to need you to rephrase. That's unclear.

Q. Sure. Did you attend an executive -- or excuse me. Did you attend a board meeting on August 8, 2025?

A. I did.

Q. And let me talk about your -- at the time you were employed, you were working remotely from Arizona; is that correct?

A. Yes -- yes, primarily remotely.

Q. And so let's talk a little bit about how that remote employment came about. Were there any other attorneys within the Kansas State Board of Healing Arts who were working remotely, to the best of your knowledge?

A. That is not a simple question -- there's not a simple answer to that question because of the COVID protocols that had started and then kind of evolved. It was a constantly moving target as to how exactly the agency was handling remote work and in-office expectations, and it was not handled very clearly. So I can't really directly answer how many attorneys. It was a very fluid situation.

And then it ultimately required some

Page 22

because that had not happened in my time there.
And then, I mean, I was here the entire month of June in 2025, and part of May, to help with our law clerk and their summer program that they were kicking off.
So I -- it wasn't unusual for me to be there.
Q. And when you say "to help with our law clerk," was that the law clerk that was assigned to the disciplinary department?
A. Yeah. They were trying to do a summer intern program through the State of Kansas's summer intern program.
Q. Was that different than the assignment that had been given to you as a law clerk?
A. Somewhat.
Q. How is it different?
A. It was just for the summer, and it was part of some -- some official Kansas thing that they do to promote internships.
Q. Okay. Did -- as to the August 8 board meeting that you attended, did anybody from the Kansas Board of Healing Arts request your attendance at that board meeting?
A. No, not specifically.

Page 23

Q. Did you advise anybody within the Kansas State Board of Healing Arts that you were going to be attending that board meeting?
A. Probably, but I -- I don't specifically recall.
Q. Was there any advanced approvals that were required for you to attend the board meeting?
A. No.
Q. Did you need to let anybody within the disciplinary department know that you were going to be at the board meeting?
A. No, attendance is expected, if not even required, of the attorneys to be at them. So even if I was in Arizona, I still attended the meetings.
Q. And if you attended the meetings, were you able to attend remotely or --
A. Mm-hmm.
Q. And so -- and that was a "yes"; is that correct?
A. Yes.
Q. And you'll have to answer orally.
And by attending remotely, how did you do that?
A. A Zoom link would eventually -- well, often was forgotten to be shared with me. But, eventually,

Page 24

I would get it --
Q. Okay.
A. -- and would join.
Q. Now, are Kansas State Board of Healing Arts board meetings publicly available on YouTube?
A. Yes.
Q. Okay. And are they consistently at the same Zoom link?
A. No.
Q. And so did you have -- did you know who to contact to say, "Hey, I want to attend this board meeting remotely. Can you send me a Zoom link?"
A. I would just ask my supervisor for it. It was sent out to all of management, was my understanding. And then if they didn't remember to forward it to me, then I would have to ask for it.
Q. And did you ever do that?
A. Yeah.
Q. Now, what about attendance in person? You weren't required to attend board meetings in person; is that correct?
A. Yeah. There was no requirement.
Q. Okay. Did you have a role at any of the board meetings?
A. What do you mean by "role"?

Page 25

Q. Did you represent anybody at any board meetings?
A. No.
Q. At the board meetings, in other words, you were not counsel for the board, correct?
A. Correct.
Q. Who was counsel for the board?
A. The general counsel department.
Q. And at the board meetings, would it be fair to say that there could be roles for the litigation -- some of the litigation attorneys at the board meetings; is that correct?
A. Yes.
Q. What would those roles be for the litigation attorneys at the board meetings?
A. To present the case on behalf of the disciplinary panel.
Q. And to present the case, for those who are unfamiliar with how a disciplinary board or a board of healing arts might operate, what does that mean?
A. Can you rephrase?
Q. Sure. Let's assume that there is a disciplinary matter involving Dr. Jones, hypothetical Dr. Jones, that is set before the board on a given day. What's the role of litigation counsel at that

Page 26

board meeting?
A. If it's their case, then they represent the disciplinary panel's opinion on how -- what discipline should be applied.
Q. And what is a disciplinary panel?
A. It's a subpanel of board members, essentially.
Q. And what does that subpanel of board members do?
A. They meet regularly to hear the cases -- just the one side of the case, you know, from our investigative materials -- and determine, if action is warranted, what their recommended action is and so on.
Q. And then does the healthcare provider have an opportunity to respond and present evidence at the board meeting?
A. Generally, to my knowledge, yes.
Q. And at those board meetings, with regard to that presentation of evidence, the attorneys who are involved in that are the attorneys in the litigation department, correct?
A. Can you clarify? You mean involved in presenting --
Q. In presenting the evidence before the board.

Page 27

A. Yes, the litigation attorneys, generally, would be the one to do that. Although, on a rare occasion, a disciplinary attorney might if there's a specific matter.
Q. Okay. And did you ever present evidence before the board?
A. Not in a hearing, no.
Q. On -- for the August 8, 2025, board meeting, you weren't on the agenda for any reason; is that correct?
A. What do you mean by --
Q. There wasn't anything on the agenda that required your attendance?
A. I mean, a disciplinary report is always part of the agenda, and I am the one who was in charge of and responsible for creating the disciplinary report. And I did, on occasion, present on behalf of the disciplinary counsel for the -- that purpose.
Q. On August 8, 2025, did you have such a role?
A. Not specifically.
Q. Okay. Had you told Susan Gile that you were planning to attend the board meeting that day?
A. No.
Q. And had Susan Gile directed you to attend

Page 28

the board meeting that day?
A. No.
Q. And who -- just so that we have it established, who is Susan Gile?
A. The executive director.
Q. And to the best of your understanding, where does the executive director fit in the hierarchy at the Board of Healing Arts?
A. They handle the day-to-day operations at the direction of the board. And it should be equal to the general counsel's role, with the general counsel giving the legal side of things.
Q. And who was legal -- or general counsel?
A. Derenda Mitchell.
Q. Was Derenda Mitchell legal counsel when you first were hired?
A. No.
Q. Who was legal -- general counsel at the time?
A. Courtney -- at the time, her last name, I think, was Sizeman. It has changed several times since I've known her, and I think she has been married recently. So I don't know what her last name is now.
Q. In anticipation of coming to the -- or strike that.

Page 29

Did you have anybody within the disciplinary department who you considered a close friend?
A. A few people.
Q. And who would those have been?
A. Well, at what time?
Q. Let's say in the summer of 2025.
A. There was a lot of turnover, and I don't remember exactly when people left, so I'm not sure.
Q. Okay. Let me go back to the summer of 2025. Do you recall who the other attorneys were in the disciplinary department in the summer of 2025?
A. There would have been Nancy Dodik, until she was no longer at the agency, Tammie Mundil, and Sarah Peterson-Herr, I think, and then the law clerk, who is not an attorney but in law school, and myself.
Q. Okay. And then within staff, were there any staff members in the disciplinary department that you considered close friends?
A. At different times.
Q. Let's talk summer of 2025.
A. Again, I don't remember exactly when people left. I don't -- there would have only been one person, and I don't know when they left the department.

Page 30

Q. And who was that?
A. Her name was Angela.
Q. Do you know her last name?
A. Mordecai.
Q. Now, let's go other attorneys outside -- or within this Board of Healing Arts, but not in the disciplinary department. Were there any attorneys you considered close friends among the other attorneys in the Board of Healing Arts in the summer of 2025?
A. How do you define "close friend"?
Q. How would you define it?
A. Very narrowly, and so the answer would be no.
Q. Okay. And how about staff members in the Kansas Board of Healing Arts in the summer of 2025 that you considered close friends?
A. I don't know when people left.
Q. Okay. In the summer of 2025, and let's make it, say, early August of 2025, before the August 8th board meeting, is there anybody within the department that you would regularly have text messages with?
A. Potentially, because it wasn't uncommon for, like, Nancy or Tammie to send out -- or, really, anybody else in the department to just send out a,

Page 31

like, group, "I'll be in at this time. I have an appointment," or sick kid or something. So it would have been something like that.
Q. From the summer of 2020- -- or if one wanted to take a look at your text messages from the summer of 2025 within the department, have you preserved those text messages?
A. I can't answer that at this time.
Q. Have you taken any special efforts to make sure that your text messages from August of 2025 are preserved?
A. What is a special effort?
Q. Have you done what's called a litigation hold or a legal hold to make sure that any evidence in the case is preserved?
A. I'm not sure what that would even look like or mean.
Q. Okay. Have you deleted any of your text messages with anybody from the Board of Healing Arts, or formerly from the Board of Healing Arts, since August of 2025?
A. I can't answer that.
Q. Don't know one way or the other?
A. No.
Q. Okay. Have you -- let's say, after

Page 32

August 8, 2025, have you had e-mail communications with anybody who is or was employed by the Board of Healing Arts?
A. Did you say after August?
Q. August 8, 2025.
A. Well, Rikki Price e-mailed me to communicate that there would be a phone call on whatever date.
Q. Anyone else?
A. That is -- that's the only one I can think of, so I don't recall any others.
Q. There was -- or you brought with you to the August 8, 2025, board meeting a pen that serves as a recording device; is that correct?
A. That is correct.
Q. Where did you obtain that pen?
A. I don't know.
Q. Do you have any idea where you obtained it?
A. No.
Q. Why did you obtain a pen that served as a recording device?
A. To help with my ADHD and other symptoms. I've had either that or a similar device multiple times throughout my life.
Q. How does the pen help with your ADHD?

Page 33

A. I can record reminders and have something to reference back to.
Q. What types of reminders would you record?
A. All kinds of things.
Q. Was -- do you know the model of the pen? If you -- if you wanted to go on Amazon and get the same pen, what would you look for?
A. I don't know -- I don't know the type. I don't know specifics.
Q. Do you have any -- did you purchase it on Amazon, or did you purchase it somewhere else?
A. I don't know.
Q. Other than to record reminders, is there anything that you ever recorded with the pen?
A. I would record certain conversations or meetings, if I was going to need to reference back.
Q. Okay. What types of conversations or meetings did you record?
A. A variety.
Q. Did you ever record meetings in which you were not present?
A. Not to my knowledge.
Q. Is there a reason you didn't record meetings in which you were not present?
A. Because I would have no use for that.

Page 38

A. No.
Q. Were you authorized to record any of those executive sessions?
A. No.
Q. In terms of those executive sessions, do you understand that they were entitled to confidentiality because they were subject to the attorney-client privilege, correct?
A. If it was a session that qualified for that, then yes.
Q. And in terms of that confidentiality, that would mean that you were -- you were not entitled to hear what was going on; is that correct?
A. That's a reasonable inference.
Q. During that board meeting, did you have an understand- -- or prior to or during that board meeting, did you have an understanding of any of the executive sessions that were to take place?
A. What do you mean?
Q. Did you have an understanding of any of the topics that were going to be discussed in executive session that day?
A. Not specifically, just what would be on the agenda.
Q. Did you have an understanding, generally,

Page 39

of any of the topics that would be on -- in executive session that day?
A. No.
Q. Did you have any understanding that Nancy Dodik would be discussed at any of those executive sessions that day?
A. No.
Q. Did you have any interest in any executive session that might involve any persons who might be subject to those executive sessions that day?
A. No.
Q. Did you text with anybody during that executive session that day?
A. I have no idea.
Q. What would be the purpose of having with you at the -- or at the board meeting that day a recording device, like a pen?
A. What do you mean?
Q. Why would you bring that to a board meeting?
A. It was -- I always have one of them, at least, with me. It wouldn't have been specific for the meeting. It's just with me.
Q. When you were at the board meeting that day, was there an instruction given to the audience,

Page 40

including you, that, "We're going into executive session, and all recording devices must be removed from the room"?
A. There was an instruction. I don't remember specifically what they said other than, "Take your laptops and cell phones."
Q. And did you understand the reason for that?
A. Generally, I suppose.
Q. What was your general understanding?
A. To take our laptops and cell phones with us.
Q. Because?
A. They'd never done that before.
Q. The -- you understand that a cell phone can be used to record information, correct?
A. Yes.
Q. And do you understand that if somebody's going into an executive session, that there should be no cell phone in the room because it might record information, correct?
A. I don't know how to answer that. So --
Q. What's complicated about the question?
A. Can you ask that again?
Q. Do you understand that the reason for not leaving a cell phone in the room is that confidential

Page 41

information is going to be discussed, and no one wants that recorded on a cell phone, correct?
A. That's a fair inference.
Q. Likewise with a laptop, correct?
A. Again, fair inference.
Q. And likewise with a pen that looks like a pen but is a recording device, correct?
A. You can make your own inference.
Q. As a lawyer, you have a duty of confidentiality, correct?
A. Yes.
Q. And you have a duty of competence as well, correct?
A. Yes.
Q. So if you own a pen that serves as a recording device, you need to know how to turn it on and turn it off, correct?
Correct?
Is that correct?
A. I wouldn't -- I wouldn't say it so plainly.
Q. How would you say it?
A. I -- I -- yeah, I'm not sure how to answer that.
Q. Is there a reason you did not remove the recording device from the board room when the board

Page 42

went into executive session?
A. There's no specific reason, because I did not remember that it was in there.
Q. Okay. Let's assume, for the sake of argument, that when the board went into executive session, that the recording device turned on. And that when the board completed its executive session, the recording device, thereafter, turned off.
Are you the person who would have turned it on and turned it off?
A. No.
Q. Do you believe you know who -- that some other person turned it on or turned it off?
A. I cannot speak to that.
Q. Okay. Do you know how it is that the pen turned on for multiple executive sessions and turned off at the conclusion of multiple executive sessions?
A. I don't even know that that happened.
Q. Okay. If it happened, who would have turned it on?
A. I can't speak to that.
Q. Are you saying it wasn't you?
A. It absolutely was not me.
Q. And who turned it off? Are you saying it wasn't you?

Page 43

A. It was not me.
Q. After the first executive session, did you remove the pen from the room?
A. I have no idea.
Q. And after the first executive session, were you gone from the room for an extended period of time?
A. I don't know.
Q. Did you listen to the first executive session after you exited the room and before you returned?
A. I did not.
Q. Did you communicate with anybody during the -- or let's -- first of all, did you communicate with anybody about the executive sessions during the board meeting that day?
A. What do you mean?
Q. While you were there, did you text or speak to whoever was sitting next to you or anything about the executive session?
A. What do you mean "about the executive session"?
Q. Did you have a conversation pertaining to the executive session?
A. I -- I have no idea.
Q. There was a person sitting next to you

Page 44

named Tonya Sotkovski?
Do you know Tonya?
A. I do.
Q. How do you know Tonya?
A. Co-workers. Former co-workers.
Q. Do you -- do you recall any conversations with her during the board meeting that day?
A. Not specifically.
Q. Did she know you were coming to the board meeting that day?
A. I believe she probably did.
Q. What did you know about that? What had you told her about you coming to the board meeting that day?
A. Nothing specific to the board meeting.
Q. Did you discuss an executive session involving Nancy Dodik with Tonya Sotkovski?
A. No.
Q. I'm going to skip ahead briefly. At the conclusion of the board meeting, were you interviewed by an investigating officer?
A. No.
Q. At any point, were you interviewed by a police officer?
A. No.

Page 45

Q. You've never been interviewed by a police officer?
A. I have not.
Q. Even in the presence of Mr. Mitchell?
A. No, not at all.
(Stenographer clarification.)
A. No, not at all.
Q. (By Mr. Rupp) Do you know if Ms. Sotkovski was?
A. Not specifically, no.
Q. Let me -- do you know who Officer Hummel is?
A. I do not.
Q. Have you ever spoken with anybody from -- whether it's the Capitol police or the Shawnee County Sheriff's Department or the Topeka Police Department, anyone, about the pen?
A. I have not.
Q. What was your understanding of what became of the pen?
A. I was told by Susan Gile that the officer that day had it; however, Derenda Mitchell's complaint narrative indicates that is not true, and that Susan Gile has had it in her possession.
Q. And what document says that?

Page 54

A. I would not be shown a tape.
Q. Right. So this -- I'll represent to you this is after -- after return from the -- from the first executive session.
MR. RUPP: And, Hannah, if you could turn this on.
(Video played.)
MR. RUPP: And go back just a second. Bear with me just a second.
Oh, thank you so much.
MR. MITCHELL: It's on your lapel.
MR. RUPP: I'm close to -- I'll speak very loudly with the hope that I can be captured. But I'm going to move up here.
Q. (By Mr. Rupp) And we are back in this session, and let's -- kind of as a starting point, let's talk about -- let's identify some of the folks who are currently on camera.
There's a person right here. Who is that?
A. It appears to be Warren Wiebbe.
Q. And Warren Wiebbe is who?
A. One of the deputy general counsel.
Q. Okay. So he would be in -- in the general counsel's office with Derenda Mitchell, correct?
A. Correct.

Page 55

Q. Who is this?
A. It appears to be Brad -- or Bradley Taylor, who is the other deputy general counsel.
Q. So he would be general counsel, along -- or in Derenda Mitchell's office, correct?
A. He would work under her.
Q. All right. In the first row, behind the podiums here, are those the litigation counsel?
A. And others.
Q. Okay. Who is this person there?
A. Looks like it would be Matt Gaus.
Q. And who is Matt Gaus?
A. He was litigation counsel.
Q. Okay. And next to him is?
A. Katie Curtis.
Q. And Katie Curtis is who?
A. A paralegal.
Q. Okay. And in the -- so the folks in the first row would be associated with the litigation counsel's office; is that correct?
A. I can't see the whole row, but --
Q. Those that are --
A. -- yeah.
Q. Is that the way it typically works, is the first row is litigation?

Page 56

A. No.
Q. Okay. Who are the folks in the back row that you can see? Recognizing that these rows go on in others.
A. I can't tell.
Q. Okay. Let's start the clip very slowly here. Slow motion.
(Video played.)
MR. RUPP: And because it's so slow, we may not be able to -- hold on just a second here.
Q. (By Mr. Rupp) This is a -- who is this person here, that's walking across the back of the room?
A. It looks -- it looks like it could be me.
Q. Yeah. And so let's watch as you exit the room here.
(Video played.)
MR. RUPP: Okay. Stop right here. Stop right here.
Q. (By Mr. Rupp) Do you know if you have something in your right hand as you're exiting the room there?
A. I don't know.
Q. Okay.
MR. RUPP: And then let's -- slow motion, just take another couple steps or two. Go ahead.

Page 57

(Video played.)
Q. (By Mr. Rupp) Okay. As you're passing before the officer, do you move something from your right hand to your left hand there?
A. I don't know.
Q. Okay. But you understand there's an officer in the room; is that correct?
A. Yeah, that's normal.
Q. And you're walking past him to get out of the room following the executive session; is that correct?
A. It appears so.
Q. Okay. Now, you've just returned to the room as the folks in the room are allowed to come back into the room after the executive session. You quickly exit the room. It appears that you have moved an object from your right hand to your left hand, and then you exit the room.
Do you know why you exit the room at that point in time?
A. I don't recall specifically, no.
Q. Okay.
MR. RUPP: Let's go ahead, Hannah, and finish this section. You can run it at regular speed.

Page 86

represented the board at board meetings where the conduct at issue occurred, correct?
A. Correct.
Q. Ms. Mitchell sat next to the board president at the board table, correct?
A. Sometimes, yes.
Q. And Ms. Potter sat in the audience, correct?
A. Yeah, sure, if that's the audience.
Q. And regardless, Ms. Potter is accountable for her conduct under the Kansas Rules of Professional Conduct.
You'd agree with that?
A. Yes.
Q. It says: "During the first of four executive sessions recorded by Ms. Potter, only the executive director and I remained in the room with the board to discuss a personnel matter."
That's true, correct?
A. I have no idea.
Q. Okay. You don't have any reason to disagree with that, in other words?
A. I have no reason to know one way or the other.
Q. "Two of the other executive sessions that

Page 87

Ms. Potter recorded pertained to individual cases heard by the board under the Kansas Administrative Procedures Act. The fourth recorded executive session pertained to another personnel issue."
You're not disagreeing with that?
A. I can't speak to it at all.
Q. "In any event, Ms. Potter was not a party to the executive sessions she secretly recorded and was asked to leave the room with other employees so that they would not hear what the board discussed with its general counsel."
Is that a true statement?
A. I would say that it is inaccurate.
Q. What's that?
A. I would say it's inaccurate.
Q. What's inaccurate?
A. I mean, I was not a party to the executive sessions, but I object to the statement implying -- well, not even implying -- just saying, "She secretly recorded and was asked to leave."
Like, that did not...
Q. You were asked to leave the room, correct?
A. I was asked to leave the room.
Q. Okay. Said: "Music even played in the conference room next door so that any sounds coming

Page 88

from the board meeting were inaudible during executive and closed sessions," correct?
A. Sure. I don't know.
Q. It says: "On August 8, 2025, upon learning a disguised -- of the disguised recording device, the Capitol Area Police confiscated it."
That does not say that Ms. Gile confiscated it, correct?
A. It does not say that, but I have no idea what happened.
Q. Okay. But what this says is that -- not that Ms. Gile confiscated it, but that the Capitol Area Police confiscated it, correct?
MR. MITCHELL: Object to form, asked and answered.
Q. (By Mr. Rupp) Go ahead.
A. That's what it says.
Q. Okay. And: "Ms. Mitchell advised Ms. Gile to put Ms. Potter on paid administrative leave so that we could investigate the matter further."
That's correct?
A. I'm not in a position to speak to that.
Q. Okay. "Rikki Price, the agency's human resource manager, prepared the notice of administrative leave that was handed to Ms. Potter.

Page 89

Our IT network administrator curtailed any access by Ms. Potter to any agency files, digital or otherwise. And the Capitol police escorted Ms. Potter from the agency."
Is there anything about that statement that you disagree with?
A. I can't speak to Ms. Price's role or the IT department's role, but the Capitol police did escort me.
Q. Okay. It says: "However, before we were made aware of the disguised and hidden recording device, Ms. Potter took it and walked somewhere outside of the agency."
Anything that you disagree with about that?
A. I have no idea. I can't speak to that.
Q. Okay. "Ms. Gile, who had listened to the recording the next week as part of the investigation into Ms. Potter's conduct, told me you can hear Ms. Potter's footsteps on the recording as she's leaving the room."
A. I can't speak to that.
Q. Okay. "We do not know whether Ms. Potter listened to the executive session, whether it was copied, shared with anyone, downloaded, or transcribed."

Page 114

you?
A. That's an ever-moving -- or if you know anything about neurodiversity, it affects all kinds of things. I can't specifically say.
Q. All right. And let me ask it differently, and let's kind of focus on July and August of 2025. Were you having any reactions to your ADHD in July or August of 2025 that affected your abilities at all?
A. No, not that I am aware of.
Q. Okay. And at any point in time, have you received any medical or psychological treatment for anything that you attribute to the actions of the Kansas State Board of Healing Arts in this matter?
A. I'm not sure it -- it's far more nuanced than that.
Q. What do you mean by that?
A. Well, these things don't exist in a silo or a, you know, vacuum chamber.
Q. Okay. So would there be any medical record that would attribute any sort of medical care to anything you believe was caused by the Kansas State Board of Healing Arts in whole or in part?
MR. MITCHELL: I'm going to object to that, just because we've only claimed garden variety emotional distress. You can go ahead and answer,

Page 115

though.
A. I don't know. I don't go back and read my doctor's -- you know, they're pretty base -- unfortunately, they're not required to go into a lot of depth in their notes.
(Exhibit 8 was marked for identification.)
Q. (By Mr. Rupp) Let's go to Exhibit 8. Exhibit 8 is a letter dated August 14, 2025, from Susan Gile, and it is the letter advising you that your employment will end effective today, August 14th, 2025; is that correct?
A. Yes, that's what it says.
Q. And this indicates that you're going to remain in pay status until September 2, but your duties have been concluded; is that correct?
A. That was my understanding, yes.
Q. And one of the copies that was sent was a copy sent to your attorney, Mr. Mitchell; is that correct?
A. Yes.
(Exhibit 9 was marked for identification.)
MR. RUPP: Sorry. Not very good at throwing these.
MR. MITCHELL: Big table.
MR. RUPP: It is a big table.

Page 116

Q. (By Mr. Rupp) I've handed you what has been marked as Exhibit Number 9, and this is a position description for the position of disciplinary counsel.
Is that the title to which you were hired?
A. I was an associate disciplinary counsel.
Q. Okay. So you were not -- you were not disciplinary counsel. You were associate disciplinary counsel --
A. Correct.
Q. -- right? Okay.
On the second page, it says "job duties," and it says: "Assists disciplinary counsel and deputy disciplinary counsel."
Is that a job description that fits with what you were doing, or is this a description for a different position?
A. So this specific version was -- is not the one --
Q. That you were --
A. -- that was in place when I was hired.
Q. Okay.
A. But as far as the content of that first job duty, I mean, yes, it was part of the role to assist --

Page 117

Q. Okay.
A. -- the, you know, disciplinary counsel.
Q. So the description of your job -- or of job duties for this position that appears on the second page, which has DEF176 on the bottom, does that accurately reflect your job duties, as you understood them to be?
A. The percentages notwithstanding, because I -- that could be a whole nother conversation, exactly what the breakdown was. But this list of job duties is a fair representation of the job.
Q. Okay. And let's talk about this description on the percentages. So in terms of the first description of the job duties, you are assisting disciplinary counsel and the deputy disciplinary counsel; is that correct?
A. When they're -- during the course of my employment, there was not always both of those positions.
Q. Okay.
A. Towards the end, they never -- once Ms. Dodik left and Tammie was promoted, at least in the time I was there, they never filled that deputy position. So...
Q. All right.

Page 118

A. And I'm just trying to be as clear and accurate --
Q. I appreciate that, and I'm going to go and follow up.
When you first started, disciplinary counsel was Ms. Dodik and deputy disciplinary counsel was Ms. Mundil, correct?
A. Correct.
Q. And then deputy disciplinary counsel became disciplinary counsel; is that correct?
A. Yes.
Q. That was Ms. Mundil?
A. Mm-hmm.
Q. And for a period of time, there was no deputy disciplinary counsel at the time you were terminated; is that correct?
A. Correct.
Q. And in terms of describing that percentage, it indicates that that assistance was provided -- I mean, the job duty description was 45 percent of the time. Is that what you found yourself doing in that 45 percent of the time, or is that --
A. I mean, a large portion of the time. To me, I -- I don't know how you really split the top paragraph and then the second paragraph. But between

Page 119

those two, that is the -- you know, the bulk of it. Well, no. I'm not even sure that that's -- it all intertwines.
Q. Okay. So as it's describing these job duties, it says: "This includes legal review and analysis of medical malpractice petitions." So let's walk through that, just generally.
So if a plaintiff's -- if a plaintiff files a medical malpractice claim against a healthcare provider in Kansas, a report of that makes its way to the Kansas State Board of Healing Arts; is that correct?
A. In theory, it's supposed to.
Q. Okay. And then do you review those petitions? Is that what you do?
A. That's a factor. There are -- the different types of complaints, there are slightly different processes for reviewing and handling, depending on where they came from and the licensee's current status and things.
Yeah, there's a lot of factors.
Q. Okay. And then it says: "Reviewing patient complaints." What types of patient complaints would you review?
A. Anything that came in.

Page 120

Q. Okay. So if a patient -- who would they be complaining to, the board or someone else?
A. The board, essentially. They didn't always know that. But, yeah, when you send it in, it's --
Q. To the Board of Healing Arts?
A. Yeah.
Q. "Referrals from other agencies." Describe what that would be.
A. Sometimes people would send, like, a complaint to the Board of Nursing that was actually for a doctor, or optometry and ophthalmology gets mixed up a lot, psychologist versus psychiatrist. We don't handle one. So that.
Or on a very rare occasion, they might, like, say, in their own investigation, come to the conclusion that some other actor that we were regulating at the board needed -- and they'd send it that way. So...
Q. "Information from other health" -- or "from healthcare providers." What was that?
A. Their duty to report concerns.
Q. Okay. So if -- to use an example, if Dr. Conner thinks Dr. Tony is performing surgery while under the influence, that would be a duty that Dr. Conner would have to report, correct?

Page 121

A. Yes.
Q. And then that would be investigated, correct? Or at least considered, in the first instance, by somebody in the disciplinary department, correct?
A. Yes.
Q. "Data bank reports." There is a database called the National Practitioner Data Bank; is that correct?
A. Among others.
Q. And when there is an amount paid by an insurance company on behalf of a healthcare provider in a medical malpractice case, there is a report that goes to the Kansas State Board of Healing Arts, if it's a Kansas practitioner; is that correct?
A. Again, in theory, it's supposed to work that way.
Q. All right. And that's what you might look at in the first instance?
A. There are multiple data bank types of reports. But, yeah, it all functions similarly.
Q. And what are adverse findings reports?
A. When hospital peer review committees do their peer reviews, if they find that the licensee fell into a certain level, there's, like, four -- like

SOC 1, 2, 3, and 4 is what they can find. And 3 and 4 is, I believe, the ones that they have to report to the board. 1 and 2 are just for their files.

Q. Okay. So if I understand that correctly, a hospital, for example, would have a mandatory peer review committee when certain events take place in the hospital, adverse actions, correct?

A. I believe that is how it is supposed to operate. I can't speak to whether it does.

Q. Yeah, yeah. I'm -- but in certain circumstances, those reports make it to the Kansas State Board of Healing Arts?

A. Mm-hmm.

Q. And then?

A. They would be reviewed by an attorney in the disciplinary department.

Q. Okay. And then in terms of application renewals, what's your role there?

A. The -- when licensees renew every year, they're asked certain attestation questions. And if their answer falls into -- they've change the questions over time. I don't remember if it's a "yes" answer or "no." But whatever -- whichever answer it is triggers a review, because they're -- if they haven't already, that may be the first time we're



finding out about, like, a malpractice or an adverse finding or something.

Q. Okay. It says that one of the -- going down to the 10 percent part. It says: "Assist with preparation of disciplinary investigations and presentations to review committees/councils, as needed."

What's that about?

A. Once an investigation is believed to be complete or at least, you know, substantially sufficient, it would be presented to a review committee or a review council, depending on the licensee's license type. And they would review this, generally. There's always outliers.

But generally, it was just for care-related issues. So it's peers, essentially, determining whether there was something actionable, a violation of standard of care. So we would present and prep for the meeting, review the file, present it to the members, take notes on what they had to say and their ultimate finding.

And then that would determine the next steps on that investigation.

MR. RUPP: I'll need another sticker.

(Exhibit 10 was marked for identification.)



Q. (By Mr. Rupp) Going to hand you what has been marked as Exhibit Number 10. And this indicates that it is for associate litigation counsel.

Do you see that?

A. Mm-hmm. I do.

Q. In terms of associate litigation counsel, that is a position that you were never hired for, correct?

A. Correct. I did not serve in that capacity.

Q. It is a position that reported to different people than you reported to?

A. Yes.

Q. And it had different job responsibilities than what you had; is that correct?

A. There was overlap, but there were differences, too. The litigation department is merely -- its existence is a function of a business decision. The disciplinary department is the one with statutory authority, and the disciplinary counsel is the only legally required position of the board, outside of executive director and their assistant.

The litigation department exists solely as just a business function, and their work relies on everything the disciplinary department does. And it's supposed to be more collaborative than it usually was.



Q. Okay. I want to go down to paragraph 20 on the bottom of the first page. It says: "This is a highly responsible legal and administrative position as associate counsel for the Board of Healing Arts."

Do you see that?

A. Yes.

Q. Similar language does not appear in the position description of associate disciplinary counsel; is that correct?

A. It doesn't look like they use the same language.

Q. Okay. It says: "This position involves reviewing and analyzing complaints regarding medical care and treatment and/or conduct issues of licensees, reviewing medical records, conducting legal analysis, providing legal counsel to board meetings assigned to review complaints against licensees, and litigating causes of action seeking revocation, suspension, or limitation on board licenses, when necessary."

Do you see that?

A. I do.

Q. There -- that's a completely different set of responsibilities than in the disciplinary department, correct?

A. I would not agree with that statement.

Page 126

Q. You don't provide legal counsel to board members assigned to review complaints about licensees; is that correct?
A. It's -- the review committee members would be more, but we also participated in the disciplinary panel meetings. And again, it was collaborative.
Q. You didn't litigate causes of action seeking revocation, suspension, or limitation on board licenses?
A. Less -- much less frequently, but we would on occasion.
Q. It says this person, the associate litigation counsel, handles scientifically complex litigation, including depositions."
Do you see that? Second to the bottom line.
A. Yes. Yeah, I see it.
Q. You never handled depositions, correct?
A. No, I did not.
Q. Okay. Is today's deposition the first deposition you've ever attended?
A. Yes, I believe so.
Q. And the last thing says -- is: "And acting as the prosecuting attorney at administrative hearings."

Page 127

You never did that; is that correct?
A. I was working with the disciplinary counsel as her second chair, I guess was kind of how she described it, on a matter at the time that I was terminated. Those situations did occasionally come up where we would handle stuff before the board, potentially, or before the acting -- I forgot the name of it.
But the executive director generally fills that position for certain steps within a process on certain cases. And then I was also tasked by Derenda Mitchell and the general counsel with participating and being part of the team on the unlicensed practice and corporate practice medicine cases.
So I don't think it's fair to say that there's a big difference.
Q. Certainly, in the eyes of Kansas State Board of Healing Arts, the description of the job duties of associate litigation counsel is much different than the description of disciplinary counsel, correct?
A. I'm not sure that's a fair or accurate statement either.
Q. In what respect?

Page 128

A. The agency was not good at keeping PDs, or position descriptions, accurate and up to date, or doing regular reviews on staff, or even having a uniform style or method of any of this stuff. And there was a scramble to update and change a lot of these documents in very recent time relative to when I left. And when I started at the agency, it was always everyone's understanding that it was the attorneys in litigation and disciplinary counsel -- like, general counsel was -- like I said, had that -- the screen. Because outside of unlicensed practice cases and corporate medicine stuff, that would be a direct conflict.
So I can't speak as much to the general counsel's attorney roles; however, the litigation and the disciplinary counsel roles very much overlap or intended to work together, and should have better and more frequently than they did. They're substantially similar.
Q. Would you agree that Jacob Overby was in the litigation department and not the disciplinary department?
A. That is correct.
Q. Would you agree that Caitlin Kremer was in the litigation department and not the disciplinary

Page 129

department?
A. That is correct.
(Exhibit 11 was marked for identification.)
Q. (By Mr. Rupp) I'm going to hand -- or I have handed you what's been marked as Exhibit 13; is that correct?
A. 11.
Q. 11. Okay. Number 11.
This is a -- the attachment A to a grievance that you filed on June 3 of 2024; is that correct?
A. Yes.
Q. Okay. And it says: "The following grievance occurred on an ongoing basis, and was prevented -- presented to my immediate supervisor on multiple occasions. I am not satisfied with the answer received, and concerns are still ongoing without adequately being addressed, and, therefore, request the matter to appear to -- appear to the -- to be sent to the HR and personnel officer"; is that correct?
A. Yes.
Q. The -- and I'm going to come back to the step two on the front page. But you give a narrative description on the second or third pages here, which

Page 134

Not liking the work. Having too many external demands to be able to deal with something. Saying, 'I am not doing that. It's not my job. We have staff for that.' Expressing an unwillingness to learn and understand MLO," which was our primary tool for doing our jobs, "pull reports, use relevant data, other disconcerting comments displaying overall apathy towards the department and the work we do."

And then she would make statements with competence and authority which were just wholly inaccurate, contradictory, or misleading.

Q. Let's talk about this conversation, second bullet point on the bottom of page Potter 11. Did she say she and Nancy are who they are, and they aren't going to go anywhere?

A. Yep.

Q. And did you have any complaints about Nancy's management in the department?

A. Yes.

Q. What were your complaints about Nancy?

A. Essentially boiled down to she was too nice, nonconfrontational. There were times where I would have preferred a more assertive department head, and she's fully aware of that.

Q. In terms of the operation of the

Page 135

department, you were in a lower level position; is that correct?

A. Yeah.

Q. Did you have any attorneys reporting to you?

A. No.

Q. You reported to other attorneys, correct?

A. Yes, technically. It was very independent the majority of the time. But if something came up then, yes, I would report directly to Nancy. Tammie was not a supervisor until she became disciplinary counsel.

Q. Let's go to first page, Potter 10: "Requested remedies. I offer the following consideration -- for consideration: One, restructure the department. I have preliminary ideas that I would be happy to discuss."

If -- were you under any -- was the department under any obligation that if you said you wanted to restructure the department, that they had to do so?

A. No -- I don't believe there is any obligation.

Q. Okay. And then it says: "Restructure my position to align with my unique skill set."

Page 136

What was your unique skill set?

A. I was very good at -- well, a lot of things. But data and tracking our cases, tracking when they were going to go to a review committee and who had them. I was very good at kind of logistic type, you know, strategic planning and things like that. I have a business degree, so it's kind of a natural tendency.

And so I had -- I actually was responsible for several things that the department implemented that got us out from under a significant backlog that had existed for many years, just through finding more efficient ways to do things and to streamline processes and to empower staff in different ways. So...

Q. What was your skill set in data?

A. I'm not quite sure how to answer that. I'm good at data analysis, and I understand how it works. Give me a spreadsheet, and I'm in my happy place. So...

I even reported to the board on data trends and, like I said, I would do our department reports for board meetings.

Q. Okay. You indicate that you added value to the department and agency. How did you do that?

Page 137

A. Are you referring to a specific thing --

Q. Right after "unique skill set."

A. Oh, okay. So largely, because I very much did have a good understanding and knowledge of the processes as they were. I naturally can see inefficiencies and come up with solutions for more efficient processes or, you know, whatever, and to make things flow. And so I added value largely in that way.

They also frequently referred to me as the workhorse of the department, and that's because I can take on and do, at a high level, a large volume of work. I think my record was somewhere around 50 complaint reviews in one day, ballpark.

But I -- I work very hard, and I work very smart and strategically, and I also have a very diverse background with a lot of skills and knowledge and experience and degrees that are applicable to everything the agency does.

Q. The last bullet point there is: "Relieve certain individuals of their supervisory responsibilities." You don't identify any of those individuals here yet; is that correct?

A. I did not, because this just -- I was instructed by Ms. Price to just throw out any, you

Page 150

ADHD; is that correct?
A. Yes, and not that it was just becoming apparent to me. As a society, we've come a long way in just the last probably five to ten years on recognizing that this is a huge issue in the medical community. And it was those conversations that were occurring globally that I was like, "I would like to know more."
That's what I do. I look into things.
Q. Okay. In terms of ADHD, do you take any medications for that?
A. Sometimes.
Q. And what --
A. As needed.
Q. What as-needed medications do you take for that?
A. It would be Adderall.
Q. And any others?
A. For that? No, not specifically. It's really -- there aren't a lot of treatments for it.
Q. And are you taking any medications today that are affecting your ability to answer questions accurately?
A. No.
Q. You also mentioned that you take a couple

Page 151

of medications that require in-person physician prescriptions; is that correct? I may have misunderstood, so I'm just trying --
A. Yeah, I don't know that they require in-person -- it's just that, in general, if you are prescribing almost any medication at this point, you're expected to regularly see the patient, whether telehealth or other -- I mean, there's various methods.
Q. Are you talking about pain medications here, or some other --
A. No.
Q. Okay. What medications are you talking about?
A. Well, the Adderall is one.
Q. Okay.
A. Lately, I -- fairly recent -- well, I don't know exactly when. I've been trying to manage blood sugars, so that requires, until we get that leveled off, you know, some pretty regular check-ins and things like that. So different, like, diabetes-related medications.
And then I can't think of the name of it, but it's like -- it's not an SSRI, but like an SSNI or something in that family that I've been on probably

Page 152

since before COVID. That, like -- just -- again, you can't go with -- if you want to keep the prescription, you got to go in -- I think it's, like, four months, three months, six months. I don't know if there's even a hard and fast time frame.
But yeah, so I regularly go back and make sure the dosages are right, not having side effects, that kind of stuff.
Q. I'm going to change topics now and ask for you to describe, as best you can, what you claim to be the retaliation by the Kansas Board of Healing Arts against you?
A. Well, the -- the events surrounding the August 8th board meeting and, ultimately, the termination that resulted. I mean, it's very apparent, from my perspective, that this was very much a pretextual method of getting rid of a problem, me being said problem, after I engaged in legally protected activity and filed the complaint.
And then I believe that the -- by Derenda initiating the bar complaint, that that was further retaliation and intimidation in an attempt to intimidate me to basically just disappear and not pursue this.
Q. And in terms of the legally protected

Page 153

activity, could you define specifically what legally protected activity you are referring to?
A. Pursuing gender-based pay discrimination through the Kansas Human Rights Council and the EEOC.
Q. Has anybody ever told you that the reason for your termination was related not to the recording of the executive sessions, but rather to the fact that you filed an EEOC charge?
A. No. I have not discussed that with anyone specifically.
Q. That's entirely your --
A. That's my --
Q. -- your interpretation?
A. That's my position.
Q. Do you have any documents that support that claim of retaliation?
A. Not to my knowledge.
Q. You would agree, would you not, that if somebody did the things that the Kansas State Board of Healing Arts believes that you did, that is, to leave a recording device in the room during the executive session and record those executive sessions, that that would be a -- an offense that should result in termination?
A. No, not necessarily.

Page 154

Q. Why not?
A. Well, because facts matter. And that would be like saying that if somebody sent an e-mail inadvertently to the wrong person that had information in it, they should be terminated.
Q. Let's assume, for the sake of argument, that the evidence would be that a person -- we'll create a hypothetical here -- that a person intentionally records executive sessions of a Kansas State Board of Healing Arts on four occasions in violation of Kansas law and in violation of the rights of confidentiality associated with the Kansas professional -- or Code of Professional Responsibility. Would you agree that that is the type of action that could result in termination?
A. Again, facts and specifics matter.
Q. What --
A. And that's -- that broad hypothetical.
Q. Under --
A. Also not applicable.
(Simultaneous speakers and stenographer admonition.)
Q. (By Mr. Rupp) Go ahead, if you have more to say.
A. I just said it's a broad hypothetical and

Page 155

that's also not applicable here.
Q. If I understand it correctly, the two facts that you're not certain of, or you disagree with, are, A, you haven't heard the recordings, so you don't know whether that's true or not, that you recorded four specific executive sessions, correct?
A. To my knowledge, I did not record anything.
Q. Okay. And if there are four recorded executive sessions but no other parts of the meeting are recorded, you don't know how that happened?
A. I have no idea.
Q. Do you believe Tonya did that?
MR. MITCHELL: Objection, calls for speculation.
A. Yeah, I would not speculate to anything like that.
Q. (By Mr. Rupp) And the other disagreement that I understand that you have is, if it occurred, you claim it would have been inadvertent.
Is that the gist of what you're saying?
A. All I can speak to is that I did not.
Q. Okay. And can you describe for me the -- the complaint of Equal Pay Act violations that you believe occurred to you?
A. I'm going to need you to clarify.

Page 156

Q. Well, that was a poorly phrased question.
As you would describe it, what's your Equal Pay Act charge or complaint?
A. That I was paid less than a similarly situated male doing substantially similar work, based on the fact that I lack a penis.
Q. And who was the similarly situated male?
A. The one I know for sure is Jacob Overby. There may be others.
Q. At any point in time prior to your interrogatory answers here, did you ever identify Jacob Overby as the person you're complaining about?
A. I do -- I'm not sure. I don't know.
(Exhibit 13 was marked for identification.)
MR. MITCHELL: Is this 13, Tony?
MR. RUPP: 13.
Q. (By Mr. Rupp) I've handed you what has been marked as Exhibit Number 13. Can you identify what this is?
A. A form from the State of Kansas Kansas Human Rights Commission.
Q. And have you seen this form before?
A. I believe so.
Q. Did you authorize it to be filed?
A. Yes.

Page 157

Q. Signed by an attorney on your behalf; is that correct?
A. Yes.
Q. Paragraph 1 says: "I am female. I have openly opposed acts and practices forbidden by the Kansas Act Against Discrimination."
Do you identify, other than in this broad language, what those acts and practices forbidden by the Kansas Act Against Discrimination are?
A. What do you mean?
Q. Paragraph 1 is a very broad statement. You would agree with that?
MR. MITCHELL: I'm going to object. This was drafted by the commission, per their processes.
MR. RUPP: Okay. I'm just --
Q. (By Mr. Rupp) Go ahead.
A. Where are you on this?
Q. Paragraph Roman numeral I.
MR. MITCHELL: At the bottom. Yeah.
A. All right. Can you repeat your question?
Q. (By Mr. Rupp) Sure. "I have openly opposed acts and practices forbidden by the Kansas Act of Discrimination -- Against Discrimination," correct?
A. I'm not sure what you're asking me is correct. Does it say that?

Page 158

Q. I'm asking if that's what it says.
A. Yes, that is what it says.
Q. And did you have a conversation with the Kansas Human Rights Commission to draft this?
A. I mean, they have a form.
Q. Who filled out the form?
A. I filled out the form. They then applied the form to this form.
Q. And is this what you told them?
A. That's not how -- like, this is their language, not mine.
Q. Okay. What was your language?
A. I don't remember. Whatever the form options were.
Q. At any time, in talking to the Kansas Human Rights Commission, did you identify Jacob Overby as your comparator?
A. I don't know.
Q. In any case, there's nothing on this form that identifies who your comparator is, correct?
A. That's correct.
Q. And there's nothing on Exhibit 13 that identifies what the disparate treatment was; is that correct?
A. It appears to just be the standard boiler

Page 159

point language -- or boilerplate language.
(Exhibit 14 was marked for identification.)
Q. (By Mr. Rupp) I'm going to hand you what's been marked --
MR. RUPP: Is that 14?
THE STENOGRAPHER: Yes.
Q. (By Mr. Rupp) -- and ask you if you've seen this document before?
A. Yes.
Q. Okay. And that's the Board of Healing Arts' response to the EEOC complaint, correct?
A. It appears so.
Q. And it says the EEOC complaint fails to give the required notice necessary to enable Kansas State Board of Healing Arts to identify how to respond and what records to preserve. It states insufficient information to form the basis of a legal claim.
Do you see that?
A. I see it.
Q. Okay. It says in the second paragraph that you identify no male employees anywhere in your complaint.
That's a true statement, correct?
A. It seems to be, yes.
Q. And it says: "Any comparison of salaries,

Page 160

privileges, or benefits is wholly absent."
That's true, correct?
A. Wholly absent in...
Q. In your charge.
A. Yeah. Boilerplate language.
Q. It says: "The agency has no male employee who is similarly situated to Ms. Potter. Ms. Potter is an attorney in the board's disciplinary department. There are no male attorneys in the disciplinary department, and the board has employed no male attorneys in the disciplinary department during the time frame alleged by Ms. Potter."
All of that's true, isn't it?
A. Yes. Well, I mean, no two -- that the agency has no male employee who is similarly situated, that is not true.
Q. Okay. Who -- what male employees are similarly situated to you?
A. All male employees that hold the title of associate -- whatever department attorney.
Q. And who would those be?
A. Currently, I don't know. I don't stay up to date on who is holding what positions right now.
Q. Okay. Who would those people have been when you were there?

Page 161

A. In the course of my employment there, it would have been Jacob Overby; James McSweyn; Cody something, until he got promoted to a deputy position; Sebastian Orosco until he got promoted to deputy position; Brad Taylor until he left litigation and took the deputy position in general counsel.
There could possibly have been others in that time frame. There's a lot of turnover there.
Q. How was their compensation different than yours?
A. I -- to my knowledge, every one of them is paid more.
Q. When you say to your knowledge, do you know what any of them were paid?
A. Specifically, not off the top of my head.
Q. Okay. Did you consult any documents to come to the conclusion that they were all paid higher than you?
A. Yeah, the KanView, State of Kansas's transparency website. And then I didn't -- I don't have -- like, I didn't see the -- but I was just told by Jacob how much he was offered to start and what he was getting after whatever raises went into effect.
Q. What did he tell you?
A. Again, I don't remember the exact dollar

Page 190

Q. Where did she reside?
A. Lawrence.
Q. Okay. Does Ms. Dodik still reside in Lawrence?
A. As far as I know.
Q. The next person there that you've listed as a potential witness is Caitlin Kremer. Do you know where she resides?
A. Spring Hill, I think. Kansas City metro.
Q. And do you know if she's employed?
A. As far as I know, she's still at the board.
Q. Okay. The next person who is listed there is Jacob Overby, and we've discussed him.
A. Mm-hmm.
Q. The next person is an unknown person at the Kansas Department of Administration.
Have you learned who that is?
A. No.
Q. The next person you've listed there is Todd Hiatt. Do you know where Todd Hiatt is today?
A. Not specifically. I assume he's still in Lawrence.
Q. And do you know by whom he's employed?
A. Not definitively, but he left the board to go work for the Douglas County Attorney's Office.

Page 191

Q. And what is it that you would expect him to be able to say with regard to you?
A. That -- well, I don't know what he would say -- that he could really speak to me specifically, so I don't know.
Q. The last sentence there says: "He could also speak about the preferential treatment he received from Susan Gile."
What do you believe -- has he ever told you that he received preferential treatment from Susan Gile?
A. He's never stated it that way.
Q. Okay. What conversations, if any, have you had with Mr. Hiatt that are related to any issue in this case?
A. I haven't had one-on-one conversations. It's more observations and comments made in, like, department meetings, things like that.
Q. Such as?
A. He would relay information and indicate or imply whether or not his department would also be held to that expectation, or how that was going to go. He's also told his staff that it's a 40-hour-a-week job, and even if they're salaried, he doesn't expect any more than that.

Page 192

Q. Did Mr. Hiatt make any comments about you at any time that you consider relevant to any of the issues in this lawsuit?
A. I don't know.
Q. At no point did you report to Mr. Hiatt; is that correct?
A. That is correct.
Q. And that's because he supervised litigation attorneys and not disciplinary attorneys, correct?
A. Formally, that is correct. But because of the significant overlap, there were times where one -- you know, department might defer to the other.
Q. Okay. The next person you've listed there is Rikki Price. Is there any other -- what specifically do you anticipate that Ms. Price would be able to say that's related to any issue in this case?
A. Well, she should be able to speak to the things we've covered that are listed here regarding my conversations with her, the grievance situation and how that was handled, that she was regularly required to report back information that should have not been reported back to Susan and Scott. She should be able to speak to who her contact at the Department of Administration is/was, wherever that is, and what happened there.

Page 193

And probably other stuff that I don't even know about.
Q. The next person you've listed is Derenda Mitchell. What do you anticipate that she would know about this lawsuit that would make her a witness?
A. Well, she should be able to speak to her knowledge of the pay disparities, her rationale for settling Caitlin's with no pushback and fighting mine. She could speak to events that I wouldn't have necessarily been a party to, and her dynamics with Ms. Gile and the board.
Q. What discussions have you had with Ms. Mitchell pertaining to any of the issues in this lawsuit?
A. I don't know. I can't think of specifics.
Q. Okay.
MR. RUPP: Why don't we take a five- or ten-minute break, and then I imagine I'll probably be -- one last session, probably.
THE VIDEOGRAPHER: Off the record at 3:37.
(Recess.)
THE VIDEOGRAPHER: We're back on the record at 3:54.
Q. (By Mr. Rupp) We're still within Exhibit Number 16, and I'd like you to go to Interrogatory

Page 202

wanted an explanation, or if they were just told to correct it. And that she was working on it, and to give her more time.

Q. But it's fair to say DOA -- according to Rikki Price, DOA flagged your pay as an issue?

A. That is my understanding, yes.

Q. Tell me about what was going on in your life the day of the August 8th meeting.

A. I had been sick -- you know, had a flare-up of some of my chronic conditions that week, and then had to travel to Kansas, which is always taxing. I found out that morning that my youngest was sick, and there was some communication between my husband, myself, and the school. I was trying to catch up on work e-mails and various things that had gone on in the prior days.

There's just a lot -- a lot of transition. I believe I got some doctor appointment phone call. I just -- yeah, various things just kind of getting thrown at me the whole -- that whole Friday.

And then there was the -- going with my sister -- I was looking forward to going with my sister, and after everything that happened, not being able to be there for her and to do our tradition. And then the uncertainty with work and all of it.

Page 203

It was -- yeah, it was a lot.

Q. So with the other board meetings that you attended in person, did you ever bring the recording pens with you to those?

A. I'm sure I did.

Q. Did you use them just for, like, everyday interactions, like you described earlier in your testimony?

A. I did.

Q. And do you remember -- excuse me.

Do you remember if you used the pen as you described, for reminders or for documenting conversations with other folks, on August 8th?

A. I don't remember anything specific. I was very much doing everything else, and it just -- there wasn't a situation where I expected to necessarily need it.

Q. Do you know who searched your things to find the pen?

A. I have no idea.

Q. Do you know if your things had ever been searched at work before?

A. I have no idea.

Q. In your opinion, would they have searched your things had you not filed an EEOC charge?

Page 204

MR. RUPP: Objection, calls for speculation, lacks foundation.

A. At this point, I wouldn't put anything past them.

Q. (By Mr. Mitchell) Would you have gained anything by recording the board's executive sessions or the public parts of the board meeting, for that matter?

A. Not that I can think of.

Q. And finally, was it your intention to record executive sessions of the board?

A. Absolutely not.

MR. MITCHELL: I have nothing further.

MR. RUPP: Nothing further.

MR. MITCHELL: Okay.

THE VIDEOGRAPHER: Okay. I will take us off the record at 4:13.

MR. RUPP: Are you going to read and sign or --

MR. MITCHELL: We'll waive reading.

THE STENOGRAPHER: What kind of transcript?

MR. MITCHELL: E-Tran.

MR. RUPP: E-Tran. Don't need to attach video.

(WHEREIN, the deposition was concluded at 4:13 p.m.)

Page 205

CERTIFICATE OF STENOGRAPHER

I, Meghan N. Minnick, RPR, CCR-MO #1428, CCR-KS #1787, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me to the best of my ability and thereafter reduced to typewriting under my direction; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

*Meghan Minnick*

Meghan N. Minnick, RPR, CCR-MO #1428, CCR-KS #1787