EXHIBIT 2



IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| BRITANI POTTER, | |
| Plaintiff, | |
| v. | Case No. |
| STATE OF KANSAS, | 2:25-CV-02743- |
| Defendant. | JAR-GEB |

DEPOSITION OF RIKKI PRICE

| | |
|---|---|
| DATE: | Thursday, September 10, 2026 |
| TIME: | 12:55 p.m. |
| LOCATION: | Kansas State Board of Healing Arts<br>800 Southwest Jackson Street, Suite 700<br>Federal<br>Topeka, KS 66612 |
| REPORTED BY: | Kathleen Behrens |
| JOB NO.: | 8434426 |

Page 10

A It could be something in relation to pay. I know she had reached out for FMLA documents, different things like that.
Q In your role as HR, was Ms. Potter ever disciplined or otherwise coached on her performance to your knowledge?
A Not to my knowledge.
Q And what were Ms. Potter's job duties?
A I cannot specifically state without looking at the position description, but she was an attorney within the disciplinary department.
Q And my understanding is that the board has two kind of departments for attorneys, and it's the discipline and the litigation. Is that correct?
A Correct.
Q And I know you don't have the specific descriptions in front of you; but just generally, what's your understanding of how an attorney in the discipline department differs from one in litigation?
A The biggest thing is litigation attorneys litigate the cases in front of the board in administrative hearings. The discipline attorneys review complaints more on the administrative side of things.
Q How would you say that the departments

Page 11

overlap, if at all?
A I would say just the work in itself, from reviewing cases or complaints and moving those into the litigation department. But just that natural correspondence, I don't know if they overlap much more than that.
Q And to your knowledge, does an attorney who, for example, is a discipline unit attorney, do they need anything -- or does a -- strike that. That's a bad question. How do I want to say this?
Does one attorney in a department need anything that an attorney in the different department -- my brain is not functioning. I apologize.
Are there any qualifications needed for a litigation attorney that a discipline attorney does not need to work for the board?
A Qualifications?
Q Yeah.
A Statewide, there's qualifications, needing their JD, that kind of thing. Skills and those types of things would differ based on the positions.
Q And differ how?
A Well, litigation, you would need probably the litigation skills to be able to say that you can

Page 12

get up and litigate a case versus in discipline, those skills are not as needed. It would be more administrative-type work.
Q Does the board have a pay scale for its employees and their different classifications?
A It's outlined by the Department of Administration. Approvals go through them.
Q When you say, "Approvals go through them," what do you mean?
A So, to explain the whole process on how that works is everything has to be submitted over to the Department of Administration. Without their approval, we can't do anything internally. I can't post. I can't make an offer. I can't give a salary increase. Everything is ultimately decided by the Department of Administration.
Q So, is there anything that the board can do with regards to pay, or is it all --
A We can justify. We can counter and say, "Hey, we disagree." But, I mean, once the Department of Administration makes their determination, no.
Q Okay. Ms. Price, have there been other complaints of pay equity made within the board?
A Yes.
Q Can you tell me about those?

Page 13

A There was an employee that had filed an EEOC complaint with pay being the official cause.
Q And was that Caitlyn Kremer?
A Yes.
Q What was your role in that matter, if any?
A I communicated with the Department of Administration.
Q And what did the Department of Administration say in that matter?
A Can you be more specific?
Q Yeah. What was their posture on Caitlyn's pay compared to male employees?
MS. O'KEEFE: Object to form and to the extent you're going to communicate anything in which counsel was involved. So, whether it was an attorney for the D of A or the agency, I'm going to direct you not to answer that.
So, if you can answer that without sharing what attorneys told you, then that's okay.
THE WITNESS: No.
BY MR. MITCHELL:
Q No. Okay. Did the Department of Administration ever bring up to you or question why Ms. Potter's pay was what it was?
A There was an email stated in reference to

Page 14

pay discrepancies, and we had explained that to them why there was a difference.
Q Okay. I am going to hand you what I've marked as Exhibit 1.
(Exhibit 1 was marked for identification.)
This was produced to us by your attorneys. Can you look that over and tell me if you recognize that?
MS. O'KEEFE: It's that same one?
MR. MITCHELL: It's Exhibit 3 from the other one. Yeah.
MS. O'KEEFE: Thanks.
THE WITNESS: Okay.
BY MR. MITCHELL:
Q So, do you recognize that email exchange?
A Yes.
Q I believe we're still looking, trying to locate what exactly the Department of Administration said to prompt your message to Susan and Scott. Do you recall what they said?
A No, I do not.
Q Okay. So, I want to direct your attention on -- this would be the first page of the exchange, the third page of the exhibit, your draft response to

Page 15

D of A.
A Okay.
Q So, the second sentence there says, "Britani Potter has already been identified, and we would like to match her pay to Caitlyn Kremer's requested salary of $75,937.50." Is that correct?
A That's what it states.
Q Okay. Do you know what you meant by "Britani Potter has already been identified"?
A She was identified to be lower on the pay discrepancies previously.
Q And identified by the board?
A Yes.
Q Okay. What conversations did you have with Britani while this matter was ongoing with her pay?
A I don't recall any specific conversations regarding pay being had with Britani during this time.
Q Did you ever tell Britani that the Department of Administration had identified her pay as a potential issue?
MS. O'KEEFE: Object to form. Mischaracterizes her testimony.
You can go ahead and answer if you have an answer.
THE WITNESS: Can you repeat the

Page 16

question? I'm sorry.
BY MR. MITCHELL:
Q Yeah. It was just did you ever communicate to Ms. Potter that the Department of Administration had raised an issue about her pay?
A I do not recall communicating that.
Q Your draft also mentions a salary route process form. Can you tell me what that is?
A It's an internal process Department of Administration has created for state agencies to request salary positions. They have some stipulations that you have to use that form.
Specifics would be if the salary is over $100,000, greater than ten percent, impacts over ten employees, that kind of thing. There's multiple different requirements that would make you have to utilize that process.
Q So, this states that in July of 2023, a salary route process form was submitted for a pay increase that approximated to 14.5 percent. Is that correct?
A That's what it states. Yes.
Q Okay. And it appears to me based on your language in the draft that the D of A said no to that request. Is that consistent with your recollection?

Page 17

A They countered the -- they didn't say no to the -- they countered with the 5.5 percent.
Q So, they said no to 14 but countered with 5.5?
A Correct.
Q Okay. So, your draft concludes by saying, "Britani was identified on the salary market survey and received approximately a 12 percent pay increase and is currently at 68,542." Did I read that correctly?
A That is correct.
Q Do you know where that 68,542 figure placed her in terms of other attorneys in the agency?
A I do not.
Q I want to take us now to the August 8, 2025, board meeting. Are you familiar with that meeting taking place?
A Yes.
Q Were you present at that meeting?
A I was.
Q Do you attend all the board meetings?
A I am in the building. I'm not physically in the meetings the entire stint. I'm kind of behind the scenes. So, that meeting, I would've been in the building but not physically in the meeting the entire

Page 18

meeting, if that makes --
Q Okay. The entire meeting. So, what role, if any, do you have on board meeting days?
A I'm behind the scenes. I help with the front desk, make sure door coverage is taken care of, mail deliveries. I assist with lunch setup for the board members, just kind of behind the scenes. If Susan needed documents, I would help bring those to her. Just kind of wherever needed.
Q So, are you familiar with the incident described in this lawsuit where a recording pen was discovered?
A Yes.
Q What was your role in that matter, if any?
A I drafted the letter for Susan as requested, and then I sat in on the meeting; but I physically was assisting with other things in the meeting.
Q Okay. And tell me about the letter that you mentioned.
A The administrative letter.
Q The administrative leave letter?
A Yes.
Q Okay. What conversations were you a part of on the August 8th day in regards to the incident and placing Ms. Potter on leave?

Page 19

A Just I was notified that there was an issue that had occurred and that they needed the administrative leave letter created for Ms. Potter and that I drafted that. And then, I attended the meeting and was told the situation that occurred. And Ms. Potter was brought in, and then we placed her on administrative leave.
Q Did Ms. Potter ever attempt to offer her side of the story on the pen?
A No.
Q Was she asked?
A We met with her at that time, and she had the opportunity to present that information.
Q But did not?
A But did not.
Q Were you aware that Ms. Potter had filed an EEOC charge of her own about her pay?
A
I think I had been made aware of the claim, but I cannot recall if that was prior to that August 8th date. I think that might have been after. I'm not -- I don't recall the date.
Q Do you know how you were made aware?
A I believe our counsel was the one that had the notification and let me know that that had been

Page 20

received.
Q Did you hear about Britani's EEOC charge from anyone other than an attorney?
A No.
Q Anyone in the office talk about it?
A No.
Q Did you hear about it from Ms. Gile?
A I believe we had discussed at times with our counsel about the situation, but not, like, one on one.
Q Okay. Ms. Price, do you know, was Ms. Potter -- the week leading up to the Friday, August 8th board meeting, do you know if she was on intermittent FMLA leave?
A I would have to look at her FMLA file. I do not recall if she was actively on FMLA.
Q Okay. And just so I'm clear, did you personally witness anything with the pen or the recoding device or any of this that took place on August 8th, or were you just notified about it later?
A I was notified about it later, and then I sat in on the conversation with Ms. Potter at the time of the administrative leave letter being issued to her.
Q What discussions took place in between the

Page 21

August 8th board meeting and when the decision was ultimately made to terminate Ms. Potter?
A I do not know. That would've been made by Susan Gile.
Q Were you on the call to terminate her?
A Yes.
Q Okay. I couldn't remember if you were there or not. So, there was no discussion with you involved in between the 8th and -- I believe the 14th is when she was terminated?
A Correct.
Q Okay. Had you received complaints about Ms. Potter or her work performance or anything like that in your role as HR?
A Yes.
Q Can you describe those for me?
A They were -- I wouldn't say formal complaints, but employees had come forward with concerns regarding Ms. Potter being a distraction in office, gossiping, that kind of thing. I had a couple supervisors, I believe, reach out.
I don't want to state who because I don't recall without looking at the actual email that I received, but I know there was emails indicating that she was not following the position description and was