EXHIBIT 3



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

---

BRITANI POTTER,
Plaintiff,
v. Case No.
STATE OF KANSAS, 2:25-CV-02743-JAR-GEB
Defendant.

---

DEPOSITION OF SUSAN OWEN GILE

DATE: Friday, September 11, 2026
TIME: 9:50 a.m.
LOCATION: Kansas State Board of Healing Arts
800 Southwest Jackson Street, Suite 700
Topeka, KS 66612
REPORTED BY: Kathleen Behrens
JOB NO.: 8434441

Page 6

A I have a bachelor's degree in social welfare from the University of Kansas.
Q Okay. And how long have you been the executive director of the Board of Healing Arts?
A So I became the interim executive director in August of '21, the acting executive director in January of '22, and the executive director, I believe January of '23.
Q What is the difference between interim and acting?
A That's a really good question. So, interim is the -- the executive director left, and so the -- the board made me the interim while they did their job search.
Q Okay.
A They did their job search, offered me the position. So then I become the acting, because this position requires Senate confirmation. So I'm acting executive director until the Senate confirmed me, which occurred in January of '23.
Q Okay. And how did the Senate confirmation go? Were there any issues with that?
A No -- no. Not that I'm aware of.
Q Okay. What is the executive director's role in relation to the board itself?

Page 7

A I report to the board. They are my boss. I am responsible for all the day-to-day operations of the agency. I oversee all of the department heads and everything that they do within the agency. So every -- basically everything that happens funnels through me ultimately, but I don't get involved in the -- necessarily in the day-to-day intricacies, if that makes sense. But I'm responsible for the budget, I'm responsible for all the human resource activities. Does that answer your question? Okay.
Q Yeah. And so, when you say "the intricacies," what do you mean by that?
A So the -- in the disciplinary department, for example, I don't get involved in the investigations. In the licensing department, I don't get involved in the license -- a specific license situation, unless something becomes problematic and it needs more oversight. Then it would come to me to -- to handle.
Q Got you. How has your working relationship been with the board members?
A I think it's good.
Q Can you expand on that? What makes a good relationship with an executive director and a board?
A Communication, I think. I respect them. I

Page 8

think they respect me. Do we always agree? Not necessarily, but I think we have, you know, communication, and we discuss our positions on matters and we come to resolution.
Q How many people do you directly supervise in your role?
A Six, I believe.
Q And what are their roles?
A So I supervise Scott Henricks, who is the deputy executive director. I supervise -- until the end of the day today, Rikki Price, who's the human resource manager. I quasi-supervised Derenda Mitchel, who's the general counsel. She's also directly hired by the board. So it's sort of a direct line to the board, dotted line to me. I supervise Tammie Mundil, who's the disciplinary counsel, and Matt Gaus, who is litigation counsel.
Q Have you ever been deposed before?
A No.
Q You've attended many of the depositions in this case, so I'm not going to go through all the ground rules with you. I think you're familiar with those by now. Is there any reason that you cannot testify fully, accurately, and completely today?
A I Don't believe so.

Page 9

Q What did you do to prepare, if anything, for today's deposition?
A I met with Counsel a couple weeks ago and reviewed some of the documents that we had previously provided.
Q Tell me about your working relationship with the plaintiff in this case, Britani Potter.
A So Britani is a -- or was a associate litigate -- excuse me -- associate disciplinary counsel in the disciplinary department. So as such, she was not a direct report to me. So I had some interaction with her, but nothing -- but I did not supervise her. We've been in meetings together, we've had conversations together, friendly conversations. She has proposed some ideas to me, things of that nature.
Q What was your interpretation of what kind of employee she was?
A Can you be more specific about that?
Q Did she do her job well? Satisfactorily?
A Yes, generally.
Q Okay. When you say "generally," what do you mean?
A So her job was to review complaints, and look at those complaints, and read them as though

Page 10

everything in that complaint, if you assume that it's true, and you compare that to whatever the appropriate practice act is. And is that -- if you assume all those facts in the complaint are true, is it a violation of the applicable practice act, and then determine, do we assign it for investigation? Do we not assign it for an investigation? That was part of her job. Part of her job was to work with the -- if -- if an investigation is assigned, work with the assigned investigator and plan and organize the investigative activities. I don't know how she was at that. I -- I don't have any information about that.

What I do know is that Britani -- well, what I have been told is that Britani tended to go outside of that and do other people's jobs -- do the jobs of the administrative support staff, which created confusion and conflict within the department.

Q When you say "support staff," would those be people below her, or how does that work?

A I don't know that I would say they were below her, because she didn't supervise anyone. So -- but they were administrative support staff. They had different job duties.

Q And when you say Britani, for lack of a

Page 11

better term, inserted herself into those job duties; how so?

A So their job -- those -- those folks' jobs was to -- if an investigation was assigned, would be to open it in Enlo, which is our system -- computer system. Or to -- and then assign the level of that investigation, et cetera. She would change it. She would bypass them and assign the investigator herself. She would have conversations that were not hers to have. She would change their processes.

They had a supervisor that was over the administrative support staff who gave them their jobs, their duties, their processes; and she would tell them: "You know, that's not how you do it. This is the -- the process and how this needs to be done."

Q Was she correct in saying that?

A I can't speak to that.

Q To your knowledge, was she ever disciplined for this type of conduct?

A Not official discipline, but there were conversations.

Q Conversations meaning, like, coaching, or what? What are we talking about in terms of conversations?

A You could -- I think you could call it

Page 12

coaching. I -- I can't speak to that in what I -- it didn't get to my level.

Q Okay. Do you know if Britani was ever disciplined, or otherwise coached on her job in general? Outside of the going outside of her job duties that we just discussed?

A Not to my level.

Q Okay. What are the job duties of an attorney in the litigation department?

A Litigation attorneys work with the disciplinary panel, which is a sub -- subcommittee, subgroup, whatever you want to call it, of the board. It's usually -- it's either four or five members of the board who they -- the litigation department will bring cases to them, and the disciplinary panel will advise the litigation department: "This is what we want you to do. We want X discipline for these licensees." And then the litigation attorneys will work with that -- either that licensee, if they are pro se, or that licensee's attorney. They negotiate settlements, they take depositions, they draft summary orders, they represent the disciplinary panel in front of the board. They are litigators.

Q And what are the job duties of an attorney in the discipline department?

Page 13

A As I explained before, they look at the complaints and they determine if they meet the requirement for an investigation to be opened, And they work with the investigators to craft an investigative plan. The investigators do their own subpoenas, but if someone doesn't respond to that subpoena, they might help with the subpoena -- motion -- motion to compel.

MS. O'KEEFE: Very good.

MR. MITCHELL: Yep.

MS. O'KEEFE: Very good.

THE WITNESS: They might do a motion to compel, then they will also help with presenting that investigation into a review committee or counsel.

BY MR. MITCHELL:

Q How do the two departments overlap or work together?

A Once an investigation is complete, if the review committee or counsel determines standard of care is not met, or it's a misconduct case, then it would move on to litigation. Litigation attorneys might look at it and they, "Oh, we need additional information, additional evidence." And so they might reach back out to disciplinary department and say, "Hey, can you go interview this one more person, or

Page 14

gather this one more or three more pieces of information for us." So that's how they might work together.

Q How do you understand the pay rates between the departments, to compare?

A I don't know that there is a -- a set comparison that I could -- you know, that I could say one is A, one is B. So yeah.

Q Are they just classified as attorneys?

A The attorneys in each department -- that is the state classification of attorney.

Q So the State just classifies both departments as attorneys?

A Right.

Q Okay.

A Right.

Q And from what I understood -- and correct me if I'm wrong -- from what I understood of the testimony yesterday at Mr. Henricks' deposition, it sounded to me like the State kind of sets the range, and then the board can kind of set the specifics within that range for a specific employee; is that correct?

A Generally, yes.

Q Okay. And once you're within that range,

Page 15

what determines where an employee's pay is set?

A So what I would look at is the job duties. Whatever successful candidate we want to make an offer to, I'm going to look at their -- well, education, they all have a JD and pass the bar, but also, how long have they been practicing? What is their experience that they're bringing into the board? So someone that is fresh out of law school versus, again, like, if we're looking at a litigation attorney, are they coming with five years of litigation as a -- as a med mal attorney? There's going to be a -- a difference in what I would be willing to pay someone in that regard. Does that make sense?

Q What was your understanding of where Britani Potter's pay was in the scale of attorneys in the agency?

A Can you be more specific of -- what was mine, or -- like, at what point in time?

Q I guess really at any point in time. Let's start with when she filed her EEOC and KHRC charge.

A So I don't know that I was really aware before that charge was filed. But at the point that I looked at it when it was filed, if memory serves, I think she was probably on the lower end.

Q Okay. What was your understanding of

Page 16

Britani's professional experience coming into when she started as a law clerk?

A I know she had a lot of different professional experience. She -- I think she had, like, a mortuary something, embalming something. I think she has a business -- I don't remember if it's an associate's or a bachelor's in business, something in business. So she has -- she has some life experience, but didn't have legal experience, didn't have -- I don't think she -- other than -- I don't think she had any medical experience that I recall.

Q Are most of the employees that -- excuse me -- are most of the attorneys that the board hires, are they closer to, at least, fresh out of law school?

A I don't think I can say yes to that. It really varies.

Q Okay.

A It's really varied.

Q So we've talked about how the State classifies everyone as just an attorney. Would you say that attorneys in the discipline department are paid more than the litigation department?

A In the discipline department paid more than litigation?

Q Yes.

Page 17

A I don't know that I would say that.

Q Is something like passing the bar on the first try for someone coming to the agency directly out of law school, is that something that would weigh in to pay versus someone who had to retake it multiple times?

A No.

Q What about class rank?

A No.

Q So if you had two candidates coming in, both directly out of law school, is there anything that would differentiate one versus the other on what their pay is ultimately set up?

MS. O'KEEFE: Object to form.

But you can answer.

THE WITNESS: Again, I would be looking at -- so -- so if you're saying they're both directly out of law school, no prior.

BY MR. MITCHELL:

Q Right.

A Because a lot, you know, a lot of people directly out of law school aren't traditional students. So if you're saying they're both traditional students, like, went undergrad straight to law school, I'm going to be looking at the position

Page 18

description, what they're going to be doing for the agency, and that's -- that would be it.

Q Okay. What about grades in law school? Does that factor into anything at all?

A I don't even know that I would have them.

Q Okay. So we talked about this a little bit, but Britani, I will represent to you, filed her charge with the Kansas Human Rights Commission on July 7, 2025. That was also dual-filed with the EEOC. When were you made aware of the charge; if you recall?

A I don't recall. I would imagine shortly after, but I don't recall.

Q Do you know when you made the board aware of the charge? Or, I guess, would the board have been made aware before you, even?

A No. I would've made the board aware.

Q Okay. And do you know when you did that?

A I don't recall. I -- it would've -- I would've made them aware the first board meeting after I was aware.

Q Okay. So I understand the board meets every other month, is that right?

A Even-numbered months, second Friday.

Q So if Britani filed her charge in July, that means the next board meeting would've been August. So

Page 19

was the August board meeting when you made the board aware of her charge?

A If I was aware, then yes.

Q Okay.

A And now that you -- yes. Now that you have refreshed my memory, yes, it was August of '25. Yes.

Q And it -- I don't need to know conversations with council or anything, but is that something you do in executive session, or what is the process of making the board aware?

A That would be a personnel matter, and it would be done in executive session.

Q Okay. Were you aware of or involved in a similar charge filed earlier in the year by Caitlyn Kremer?

A Yes.

Q And what was the resolution of that charge?

A Her salary was increased to meet that of Jacob Overbey.

Q Why was her salary increased and Ms. Potter's not?

A Jacob and Caitlyn have the same position description. They do the -- the same job duties.

Q And you don't consider, even though the state classifies them all as attorneys, Britani and

Page 20

Jacob to be the same position?

A They're absolutely not the same position.

Q Do you think there's a pay equity problem among agency employees?

A I do not. Can I -- can I rephrase that answer?

MS. O'KEEFE: Yes.

THE WITNESS: I -- I do not believe there is due to -- due to gender. I believe some of my employees should be paid more, but not because of gender.

BY MR. MITCHELL:

Q Equity isn't necessarily based on gender though; is it?

A Not only.

Q I'm going to hand you what I've marked as Exhibit 1.

(Exhibit 1 was marked for identification.)

MR. MITCHELL: And, Counsel, I apologize. I don't have a copy. It's the email exchange from yesterday.

MS. O'KEEFE: Okay.

MR. MITCHELL: Exhibit 3 from yesterday.

Page 21

MS. O'KEEFE: Okay. Thank you.

BY MR. MITCHELL:

Q Do you recognize that?

A I do.

Q And what is that, for the record?

A It's an email from Rikki Price to myself and Scott Henricks, dated November 7, 2024.

Q And if I could direct your attention to the second page of the document. It's marked Defendant 1350.

A Okay.

Q As I think we discussed yesterday, this was Scott's revisions to Rikki's draft response to D of A. Is that consistent with your recollection?

A I believe that's what it is, yeah.

Q So the second paragraph, or I guess it would be the first paragraph of the actual response, says "Pay equity is important to the agency and we continue to review and seek resolution to identify paid discrepancies within the agency." Did I read that correctly?

A You did.

Q So, I mean, it sounds to me, in reading that, like there's at least some concern about pay equity. Would you agree?

pay, we have to request that from Department of Administration. We are one agency in a state system. My job is to try to keep the pay within my agency as equitable as I can. Department of Administration's job is to keep the pay within the entire state system as equitable as they can. So when I make a request to increase someone's pay, they have to look at that in the entire -- as it would impact the entire state system.

So while I may feel like if I increase, you know, Joe Schmoe's pay in my agency, it might be equitable within my agency, they have to look at it for the entire state, and they may determine that that's too much, too little, what -- what have you. So they would counter, or just deny. And that's their rationale. So I think to say fault -- to give them fault or blame would not be appropriate.

BY MR. MITCHELL:

Q Okay. What was your reaction to finding out that Britani filed an EEOC charge, or a KHRC charge?

A I don't know that I really had one. I -- I mean, just kind of "okay." I -- I don't know.

Q Do you recall a reaction to Caitlyn's charge?

A I mean, it's -- it's every person's right to



file a claim if they feel so inclined. So we look at it, we review it, we respond accordingly.

Q So I want to move on to the August 8th board meeting.

A Okay.

Q August 8, 2025, to be clear. When were you first notified that day that there was an issue with Britani?

A Can you be more specific?

Q When were you notified about the pen?

A I don't recall what time it was. Board -- board meeting days are hectic, carried, kind of a blur. So I -- I don't know what time it was. I know at some point, Scott Henricks came and told me that someone had informed him that they believed that -- and I don't even remember if at the time they -- they said Britani's name -- but that someone told them that it appeared that a recording device was being left in the room. And I know that I told him to check it.

And then when we went into the next executive session, Scott approached Trooper Hummel to have him check. We just told the board we were going to -- I told the board we were going to just sit tight for a second; we were having something looked at. And



we did, and my thought was, this was going to take a second or two. The trooper would look at it and we would move on. That's not what happened.

Q So Mr. Henricks testified yesterday that the person who told him this was Chandni Bhakta?

A Yes.

Q Did you ever talk to Chandni about this personally?

A Yes.

Q Did you ever ask her how she knew it was a recording device?

MS. O'KEEFE: Object to form.

But you can answer.

THE WITNESS: She didn't ever know that it was a recording device.

BY MR. MITCHELL:

Q Let me rephrase, then. That's a good point. What made her suspect it was a recording device.

A She was very resistant to ever say anything. But she observed Ms. Potter multiple times. As we would go into executive session, she would place the pen to the front of this -- whatever we're calling it, pad, folio, or notebook, or whatever -- close it, and then slide the notebook forward on the desk so it was unobstructed and as close to the front of the room as



it could be. And then when the executive session was over, she would pull it back. And I don't know if she took the pen out or whatever, but she would open it again. And then when we would go back into executive session, slide the pen up, close the notebook, slide it back up again. That's what made her kind of take note.

And then she even had the thought, she's like, "What? Like, it just looks like a pen, like --" And she even Googled "What does a recording pen look like?" because she was so -- she thought it was so unlikely, and she didn't want to overreact. Chandni is very calm, thoughtful, nondramatic at all. So that's -- that's what raised her thought process in this at all to even bring it to Mr. Henricks' attention.

Q And did you talk with Chandni on the day, or was this afterwards?

A Afterwards.

Q Do you know how long afterwards? Was it, like, immediately in the following days, or was it weeks or months?

A It wasn't weeks or months. So I -- probably days.

Q Okay.

Page 30

A I don't -- I don't recall.
Q So I think you testified that you told Mr. Henricks to check the possible recording device; right? What happened after that?
A So as I said, the trooper -- he went and told the trooper, the trooper went and checked and I -- I don't know what happened over there. I stayed in my seat and they were across the room. So I don't know what happened right in that area, I wasn't there. Again, I informed the board, said we were going to sit tight for a minute 'cause we're in executive session, but the trooper's still in the room, so we couldn't talk or do any business. What I've been informed is that the trooper said he was going to take it back to his office or wherever and check it, and that he left.
So then we had the executive session. I did inform the board of what transpired, and we had the executive session. And then the trooper at some point came back, said: "It is a recording device. The computer that we need to check -- to check it on is not available until Monday. So we can't check it until then. But it is a recording device."
Q Did anyone know if the pen was on or recording at the time, since the computer was not available to check until Monday?

Page 31

A I don't believe we knew that at that time.
Q Was there ever a discussion to just ask Britani about the pen?
A No.
Q Why is that?
A I think we -- we made the decision to put her on administrative leave so we could determine what, if anything, was on the pen.
Q Is administrative leave a significant step?
A I think that's a fair statement.
Q So, I mean -- I guess -- again, you didn't know anything was on the pen. Why take that significant step?
A I think it's the totality of the events leading to the week -- or leading to the day. We didn't know she was going to be there. Nobody knew, even her direct supervisor. We knew there were going to be things discussed in executive session that involved her and people that she was close to. She likely knew that.
And she shows up and leaves a recording device in the room after there's an announcement to remove laptops and cell phones, which I think is a message to anyone in the room that means "remove recording devices." And she left a recording device.

Page 32

She's an attorney, she's a smart person. I think the totality of all of that indicated that this was a purposeful event.
Q And what was ultimately discovered on the pen?
A Recordings of the meeting, including executive sessions.
Q But also of the public portion; correct?
A Yes.
Q Is there anything wrong with recording the public portion?
A I don't know that there's anything wrong with it, but there's certainly no need to do it. And there's a lot wrong with reporting the executive sessions.
Q I guess, without having talked to Britani about the pen, though, and without knowing what was on it on the day, what led you to believe it was intentional and not inadvertent to leave the pen behind?
A I think everything I just said.
Q Is it possible that she left the pen behind inadvertently?
A I think it is highly, highly impossible.
Q Is it possible she didn't know the pen was

Page 33

on or recording?
A Again, she's an intelligent woman; she's an attorney. She left a recording device in a room during an executive session. It would be extremely irresponsible if she did that, especially after an announcement to remove cell phones and laptops.
Q Have you since listened to the full contents of what was on the pen?
A I don't know that I could swear that I've listened to the full content, but I have listened to, I -- I would say, most of it.
Q Okay. And I am not asking about the contents of the executive session, I don't need to know. Is there anything that indicates that the recording stopped and started corresponding to an executive session?
A It appears to me -- from what I have seen, it appears to me that the pen maybe records in 15-minute snippets.
MS. O'KEEFE: I think it's ten minutes, just for --
THE WITNESS: Okay.
MS. O'KEEFE: -- the sake of accuracy.
MR. MITCHELL: Okay.
MS. O'KEEFE: It resets every --

Page 34

THE WITNESS: It appears to me that it goes in segmented times.

MR. MITCHELL: Okay, that makes sense. That's the first I've heard of that. So thank you for that.

MS. O'KEEFE: And I say that just for clarification only, because when we received the recordings, it's 10-minute individual WAV files that we were provided from the Highway Patrol. That's why I assume it's a 10--minute segment. That's just what it did. And it appears to be continuous.

MR. MITCHELL: That was going to be my question; is it continuous?

MS. O'KEEFE: With the exception of -- there's --,

THE WITNESS: Yes.

MR. MITCHELL: Like, it breaks for the 10 minutes, but then it keeps going?

MS. O'KEEFE: Yeah, but there is one segment that does break before the 10 minutes.

MR. MITCHELL: Okay.

MS. O'KEEFE: Yeah. And I think we can probably produce to you just showing you the files and their, like, sort of minute-long increments.

MR. MITCHELL: Sure. Yeah.

Page 35

MS. O'KEEFE: I can -- I don't think -- that's not going to be privileged. So I can show you that, if you'd like. And also, sorry, more clarification. Not trying to take over your deposition.

MR. MITCHELL: No, you're fine. You're fine, you're fine.

MS. O'KEEFE: But we did actually get the -- I'll just wrap this up.

We did actually just get the transcript back yesterday. So I went through and I've proposed redactions, and I have those with Tony [ph] and Dorinda [ph]. We should have that too. Today, I hope.

MR. MITCHELL: Okay. Fine with me.

BY MR. MITCHELL:

Q Do you recall when the decision was made to actually terminate Britani from her administrative leave?

A Yes.

Q When was that?

A Wednesday the 13th, I believe? The Wednesday after the August 8th board meeting.

Q The -- yes.

A So I believe that would be the 13th.

Page 36

Q And what was the ultimate factor in making that decision?

A That there were executive sessions reported.

Q And that was discovered after KHP got back to you; is that right?

A Yes.

Q Okay. Was the KHP able to tell you whether or not the pen was, like, a cloud-based device, that there would be concerns that these executive sessions were floating around somewhere in the cloud, for lack of a better term?

A I don't recall that. I -- I don't know. That might have been a conversation with Mr. Henricks.

Q Okay. So you made the decision to terminate her on the 13th, and then I believe she was actually terminated the morning of the 14th; is that right?

A I believe that's correct.

Q Was there ever a conversation with Britani about whether she had access to the recordings that were discovered on the pen?

A I don't recall that there was.

Q Was there a concern that she had these executive session recordings somewhere? Because we -- I mean, we know now that the pen has to be plugged in to get them; correct? Is that your

Page 37

understanding?

A That's my understanding.

Q I just am getting out whether she was asked whether she had them?

A I don't recall that she was.

Q Okay. The last thing I want to talk about is this letter that was, I believe, sent on August 7th. Sorry, let me --

A I think it was before that.

Q I'm going to hand you what I'll mark as Exhibit 2. Do you recognize what that is?

(Exhibit 2 was marked for identification.)

A This is my statement.

Q Okay. So it starts with "On August 7, 2025, I was informed that the board members had all been sent a letter regarding my performance as the executive director of the agency." Did I read that correctly?

A Yes.

Q So how were you informed of this letter?

A One of the board members called me.

Q Okay. And do you know when they were sent the letter?

A I do not.