EXHIBIT 4



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

---

BRITANI POTTER,
Plaintiff,
v. Case No.
STATE OF KANSAS, 2:25-CV-02743-
Defendant. JAR-GEB

---

DEPOSITION OF SCOTT HENRICKS

DATE: Thursday, September 10, 2026
TIME: 10:31 a.m.
LOCATION: Kansas State Board of Healing Arts
800 Southwest Jackson Street, Suite 700
Federal
Topeka, KS 66612
REPORTED BY: Kathleen Behrens
JOB NO.: 8434426

Page 10

A That's correct.
Q What kind of working role did you have with Britani, if any?
A Very limited. I can only think of minimal conversation we ever had.
Q Did you ever speak to her more direct supervisors about her as an employee?
A No, not that I recall.
Q So, Mr. Henricks, in your role, are you familiar with the general job duties of an attorney, for the board I mean?
A Yes.
Q Okay. So, what are the job duties of an attorney in the litigation department?
A In the litigation department?
Q Yes.
A Generally speaking, they litigate cases, hence the name. But they will argue cases in front of the board on behalf of disciplinary panel and against opposing counsel. They will negotiate settlements with opposing counsel. They help monitor professional health program obligations, so ...
Q How does that compare to an attorney who works in the licensing department -- or discipline department? That's what it's called.

Page 11

A Yeah. Disciplinary, generally speaking, is -- those attorneys review complaints versus, you know, SV-associated practice acts. They screen in or do not screen in complaints. They will help guide investigators with their investigations on what's needed and what they have, et cetera.
And they will present investigations and cases to disciplinary committees -- or I mean committees or councils about whether those cases should be moved forward.
Q Do the two departments overlap at all?
A Can you explain what you mean by "overlap"?
Q Do they work together?
A I would say yes. Investigations that are assigned to litigation, I think there's -- there's some ongoing communication there. Yeah. I mean, I can't speak to how much exactly they work together.
Q Okay. To your knowledge, are there any qualifications that an attorney in one department needs that an attorney in a different department may or may not need?
A Qualifications? I -- I would -- both are attorneys. I will say that. I think with the different -- different departments, different supervisors, different job descriptions.

Page 12

Q How do you understand the pay rates between the departments to compare?
A I would say the pay rates are generally established -- I mean, there's a pay range established typically through the Department of Administration that we assign based on job duties.
Q So, the Department of Administration sets the pay scale?
A You know, I will admit I'm not fully sure on this. I think we have some say in this, you know, on the -- on the pay scales, and jobs are posted based on an approved range. That range is -- is approved by the Department of Administration.
Q And then, the specific salary is set by the executive director or the board? Who sets that?
A Correct. The ultimate decision will go to the executive director.
Q And so, you have the range for where you can set a salary. What determines where an employee is set within that given range?
A I would say generally what would -- what occurs is if the department makes a decision that they would like to make an offer within that range, that range is proposed to HR and the executive director. Their justification for what they want to pay is

Page 13

typically based on experience, education, and so forth as it compares to the job duties.
Q In your opinion, does an attorney in the litigation department and an attorney in the disciplinary department require the same skill to do the job?
A No. Litigation, I believe, takes more experience with actually arguing cases, presenting cases because that is their primary job description.
Q But to go back to an earlier question I asked, they're not required to have any more certifications or accolades or qualifications or anything like that than an attorney in the disciplinary department. Correct?
A Without the -- without the job posting in front of me, I don't -- I don't know for certain if there are any differing requirements; but I do know they're both considered attorneys.
Q Is there a differing pay scale that one is given versus the other, or is it just attorney across the board?
A That, I'm not certain of.
Q Okay. I want to move to the August 8, 2025, board meeting. Are you familiar with this meeting and what took place?

Page 14

A Yes.
Q First of all, how often does the board meet?
A Every two months.
Q Every two months. Okay. And was the plaintiff in this case, Britani Potter, present at the August 8th board meeting?
A Yes.
Q Was it -- strike that.
Britani worked remotely from Arizona. Is that correct?
A Correct.
Q How often would she come to the board meetings in person?
A I would say it varied. I don't have an exact number. Some, but not all.
Q Some, but not all?
A She was -- you know, sometimes she'd be remote, or sometimes we -- she would let us know she was coming.
Q So, from your perspective, what happened at the August 8th board meeting?
A Can you clarify or specify which part?
Q Well, we know there was an incident at the meeting. Can you describe from your vantage point at that meeting what happened?

Page 15

MS. O'KEEFE: I'm going to object just to the form. It was a pretty vague question.
But you can go ahead and answer if you know what he's talking about.
THE WITNESS: Assuming you're talking about the recording pen, I received a report that it appeared Ms. Potter had a -- was recording or had a recording device in a pen and was adjusting it prior to executive sessions and putting it in a notebook and shifting the notebook out.
BY MR. MITCHELL:
Q Who reported this to you?
A It was an employee of the board.
Q Named?
A Chandni Bhakta.
Q And how did Chandni know that this was taking place, or allegedly taking place?
A She was sitting very close to Ms. Potter and said she witnessed it.
Q Did she say how she knew it was a recording device?
A She said she suspected it might be, and she was very apprehensive to say anything because she knew it was a potentially serious allegation.
Q And what happened after you received the

Page 16

report?
A I sat with that information momentarily, and then I advised the executive director that I had a report that there might be a recording device being left during executive sessions.
Q And then, what happened?
A The executive director told me to check it, and I sat for a minute thinking about the best way to do this and what the next steps should be.
Q And what did you decide?
A I decided to tell the attending state police officer who was at the meeting.
Q And that's with the Kansas Highway Patrol. Is that correct?
A Yes.
Q And do they supervise every board meeting?
A They do.
Q Okay. And do you recall the trooper's name?
A Tyler Hummel.
Q Okay. And what did Officer Hummel or Sargeant -- Trooper? Trooper Hummel?
A I make the same -- I've never strayed on that. So, I approached Trooper Hummel, and I said -- just told him that we have a report that there may be a recording device being left during executive

Page 17

sessions and asked if he would take a look.
Q And then, what happened?
A He and I approached the area -- well, an executive session was called. Everyone was cleared out except the board members. Trooper Hummel and I approached the area where Britani was sitting -- or was seated; and I just said, "It's -- it's this area here."
Q And then, what happened?
A Trooper Hummel opened the notebook that was setting on the table, opened the cover of the -- it's a portfolio --
Q A padfolio kind of thing?
A Yeah. There you go.
Q And what did Trooper Hummel find?
A A pen. There was a pen in there and a blank -- and just blank paper. The pen was the only item in the ...
Q What did the pen look like?
A It looked like a regular pen. He removed the cap, and it clearly wasn't a regular pen.
Q Do you know if it actually had writing capabilities?
A I don't know. I never touched the pen, but at the end of it looked like the -- like a USB port

Page 18

type which you would plug into a computer.
Q So, is this on the back of the pen or where the writing utensil part would be?
A This would be where the cap -- like, if you pull the cap off of a pen.
Q Okay. So, here or here? I'm using an Apple pencil, for the record, to --
A I was looking for a pen.
Q Yeah.
MS. O'KEEFE: A pen?
THE WITNESS: Not -- the opposite of the writing end.
MR. MITCHELL: Okay. Thank you.
THE WITNESS: Yes.
BY MR. MITCHELL:
Q And you said it looks like a USB port?
A That's my -- my terminology for it. It'd look like what you would plug into a computer.
Q Then, what happened after the trooper removed the cap?
A He looked around at some other stuff; and he said, "I don't know what this is," something like that. I don't want to quote him. I'm paraphrasing. He said, "I think this is a recording device."
Q And to your knowledge, was that based just

Page 19

on the fact that it had a USB port in it, or was there something else that indicated it was a recording device?
A You -- that would need to be answered by Trooper Hummel.
Q Sure. Okay. So, the trooper says that he thinks it may be a recording device. What happens after that?
A As I recall, I advised -- well, he -- he stated he was going to take it back to their headquarters and verify what this was -- what this pen was. And then, I advised executive director and maybe our general council also that he believes it may be a recording device. He's going to check and will let us ...
Q Were they able to check immediately -- do you know -- like, that same day, for example?
A Trooper Hummel returned a few minutes later and advised myself and ultimately the executive director that they felt certain it was a recording device. I believe he even said they -- as I recall, they had located the same model, the same everything on doing a search.
He did say that the computer, the special laptop that they have that checks and verifies

Page 20

recordings on these things was out in the field and would not be available until Monday.
Q And what day of the week was the board meeting on?
A Friday.
Q Friday. Okay. Do you recall what time of day the pen was discovered?
A About -- not off the top of my head. Around -- I think right after lunch, around lunchtime.
Q And do you remember when Chandni first told you and how long elapsed before the pen was discovered?
A A few minutes. I mean, half hour maybe. I waited -- I know -- I recall waiting until executive session.
Q Okay. I see.
MS. O'KEEFE: That would've been a good sample pen.
MR. MITCHELL: It would've. Good grief.
BY MR. MITCHELL:
Q I'm going to hand you what I've marked Exhibit 1.
(Exhibit 1 was marked for identification.)

Page 21

Do you recognize this document, sir?
A Yes.
Q What is that?
A That was my witness statement.
Q Witness statement to the Kansas Highway Patrol?
A Yes.
Q I want to direct your attention to the second paragraph and the second to last sentence that starts, "When pulled apart, it was apparent this was not a standard writing utensil." Did I read that correctly?
A Yes.
Q Do you know if or when the Kansas Highway Patrol got a warrant for this pen?
MS. O'KEEFE: Objection. Not relevant and beyond the scope of the case.
BY MR. MITCHELL:
Q You can answer. That's not a valid deposition objection.
A I'd be completely unaware as to whether a warrant was -- was needed or not. That's why I told law enforcement.
Q Okay. And then, for the third paragraph of your statement that starts, "Officer Hummel returned,"

Page 22

I'll just go ahead and read this paragraph for you.
"Officer Hummel returned and advised Executive Director Gile and I there was a strong probability that the pen was also a recording device. We were also informed that the computer KHP uses to check such devices would not be available until Monday, 8/11/2025.
"Subsequently, Ms. Potter was issued a letter by Executive Director Gile with me, Officer Hummel, and Human Resources Manager Rikki Price present. Ms. Potter was escorted out of the building by Officer Hummel." Did I read that correctly?
A Yes.
Q So, it sounds like once Officer Hummel told you that the computer was not available until Monday, Ms. Potter was soon thereafter placed on leave. Is that correct?
A Yes.
Q Was there any investigation done or any conversations had with her at that time?
A No.
Q Why is that?
A As I recall, we had updated the board on the situation. Executive Director Gile did, and it was agreed to that if -- to place the employee on paid

Page 23

administrative leave until further notice. To your question, any conversation, I just know the -- eventually, the trooper approached Ms. -- Ms. Potter and said that we needed to speak with her.
Q And were you present when the trooper spoke with her?
A The trooper approached her in the boardroom and said, "We are going to" -- we met in the executive director's office. So, he escorted her into the executive director's office where the conversation occurred.
Q And were you present for that conversation?
A Yes.
Q What was the conversation?
a Executive Director advised Ms. Potter that she was being -- that she was being placed on administrative leave. I believe there was a conversation, like, regarding the pen.
Q Do you remember any specifics of the conversations regarding the pen?
A I remember saying -- or it was stated that the pen has been taken. The pen has been confiscated or seized, if you will, by law enforcement; and Ms. Potter stated she had a lot of pens.
Q Was Ms. Potter ever asked what the pen was?

Page 24

MS. O'KEEFE: Object to form.
THE WITNESS: She was advised that the -- the apparent recording pen had been taken by law enforcement.
BY MR. MITCHELL:
Q Did she attempt to present her side of the story?
A Not at all.
Q Did she say anything during this meeting?
A She said, "So, I have a lot of pens."
Q Do you know how many executive sessions had taken place when Chandni notified you of the pen?
A It was two or three.
Q Okay. And is that normal for that many executive sessions by lunchtime? That's genuinely just a curiosity question
A It completely depends on the board meeting.
Q Okay. The last paragraph of your statement starts here with, "It is worth noting that Ms. Potter's attendance at the meeting was surprising, as she is a full-time remote employee who resides in Arizona." Did I read that right?
A Yes.
Q Why was it surprising? Was it surprising for any reason besides the fact that she works

Page 25

remotely in Arizona?
A It was surprising because she's a fully remote employee; and I believe any other time a fully remote employee had been present, we had been notified ahead of time that they would be there.
Q And Ms. Potter did not notify anyone she would be there. Is that correct?
A Correct. To my knowledge, no. So, therefore, from my perspective as a witness, it was a surprise.
Q But you did testify earlier that she attends at least some board meetings in person. Correct?
A Correct. With advance notification.
Q This also says that Ms. Potter "did not work Monday through Thursday before arriving at the board meeting on Friday." Were you aware, sir, that she was coming off of what I believe was intermittent FMLA leave prior to the meeting?
A I don't recall being aware of that. I just know she had not worked.
Q Okay. Were you apprised of what, if anything, was found on the pen?
A Yes.
Q And what was that?
A The -- the board meeting, and ultimately the

executive sessions were recorded.
Q Portions of the public board meeting also, though. Correct?
A Yes.
Q Was Ms. Potter ever questioned about the pen before being placed on leave?
A Not to my knowledge.
Q Why not? I mean, why not just ask her, "Is this a recording device? Why was this left here?"
MS. O'KEEFE: Object to form.
THE WITNESS: Well, from my perspective, we found what was apparently, and now we know obviously, a recording pen. I think the fact that it happened on a board meeting is one thing. We took action to put her on administrative leave.
Personally, I would think that when confronted saying, "Hey, we have a recording pen of yours," I would give my explanation then.
BY MR. MITCHELL:
Q But was Ms. Potter afforded that opportunity, or was she simply told, "You're being placed on leave"?
A Since I -- if I recall correctly, she did not -- she said she had nothing further to say or didn't have any comments or -- that was -- that was



it.
Q So, do you believe Ms. Potter intentionally recorded the meeting?
A Yes.
Q Why is that?
A Multiple reasons including I believe she was a disgruntled employee. I believe Chandni Bhakta to be a very deliberate, well thought out person who would not jump to any sort of conclusions or allegation. She's very grounded. I think watching the video, that leads me to my position. And yes, I do.
Q Is it possible she inadvertently left the pen behind?
A From my perspective, from what I witnessed that day and the subsequent videos and audio, I would say that would be a hard argument.
Q When you say "audio," I have not been made aware of audio. What audio are you referring to?
A The highway patrol contacted us a few days later, asked if myself and the executive director could listen to clips from the pen just to determine if executive sessions were indeed on there because they didn't want to listen to it because it was the confidentiality of, you know, the legal part where you



can't listen to the executive sessions.
So, they -- they brought the pen. Trooper Hummel and the detective brought the pen over and had Ms. Gile and I listen to snippets just to verify, "Okay. This was executive session, et cetera."
Q Snippets. So, you didn't listen to everything that's on the pen?
A No.
Q And when you say "snippets," how long of clips are we talking about?
A Just a few seconds. And it's not like the pen is marked. It's just sections of audio that they click. "Listen to this. Is this an executive session? Yes? No?" Yes.
Q So, did you or Executive Director Gile get to hear when exactly the audio sessions would start and stop?
A No.
Q So, by that logic, is it not possible that Ms. Potter didn't even know the pen was recording for certain executive sessions?
A If she knew it was recording? I can't speak to that, if she knew or not.
Q But it's still your testimony that this was intentional?



A It's my belief that it was. I'm not certain, but the pen stayed in the room the entire time.
Q I am going to hand you what I will mark as Exhibit 2.
(Exhibit 2 was marked for identification.)
Have you seen this before, sir?
A There are pictures on this document, which I will represent to you as an affidavit that was produced to my office from the Kansas Highway Patrol. Could you just look at the pictures for me and confirm that that is the pen that we're talking about?
A It appears to be.
Q And if you'll flip to page 2, which is marked Defense 255, number 4 here says that this was seized as evidence on August 8, 2025, at approximately 1330 hours. Does that line up with when you remember these events taking place?
A Yeah.
Q Okay. When was the last contact that you had with the highway patrol about this incident?
A He emailed me -- I don't -- I don't recall the date -- months ago about approximate times of the executive session.

Page 34

D of A actually asked, so do you recall what the starting point of this conversation was?

A I don't. I mean, I believe it was in reference to Caitlyn Kremer's situation, but I'm not sure.

Q I think you mentioned that D of A might've identified Ms. Potter's pay as not being on the same level. Is that correct?

A Yeah. I believe that was his response -- I mean, that their response was something like that. I might -- I'm not totally certain, but yes.

I believe it was in reference to -- our request to increase the pay of one female attorney was that this -- this was the response from D of A was in reference to Ms. Potter.

Q And so, I want to read a sentence from your draft. On Defendant's 1350 where it says, "To this point, Britani Potter was identified both last year and again this year," did I read that sentence correctly?

A Yes.

Q So, what does that mean in the context of this conversation?

MS. O'KEEFE: Object to form.

THE WITNESS: It meant that we

Page 35

identified and attempted to increase her pay both the previous year and for both years.

BY MR. MITCHELL:

Q You say "attempted to." Does that mean it was not successful?

A It was successful to some degree.

Q What do you mean by that?

A I know at one point, we submitted a significant increase for Ms. Potter. I believe 14 plus percent. We submitted that -- our request to Department of Administration.

They didn't completely deny it, but they decreased it to, I want to say, less -- or four, four-ish percent. I'm not -- don't quote me on the numbers, but our request was reduced by Department of Administration.

Q Got you.

MS. O'KEEFE: I think that -- sorry. Just for clarification, 1351, there's one other page after this, 1352.

THE WITNESS: I believe there is.

MS. O'KEEFE: Yeah. That's missing from Exhibit --

MR. MITCHELL: Oh. I'm sorry. That's my fault.

Page 36

MS. O'KEEFE: No. That's okay.

THE REPORTER: Okay. I was like did I not print the whole thing?

MR. MITCHELL: I didn't realize that that was part of this chain.

MS. O'KEEFE: Okay. Yeah. It shows --

THE REPORTER: As long as it wasn't --

MR. MITCHELL: No. No. My fault.

THE WITNESS: Yeah. It shows the amount.

MR. MITCHELL: And Sara, are you okay if I just describe for the record what the little chart is on --

MS. O'KEEFE: Yeah. I think it would've helped --

MR. MITCHELL: -- 1352?

MS. O'KEEFE: Yeah. I think it would've helped Scott to see it as well because I think this is what he was trying to articulate from the previous year.

MR. MITCHELL: Sorry. I've got my brightness turned up as much as I ...

THE WITNESS: Correct.

BY MR. MITCHELL:

Q And so, Scott, if I'm interpreting this

Page 37

chart correctly, it looks like, as you described, there was a 14 percent requested; but there's a 5.5 percent highlighted in yellow. To your understanding, is that what D of A approved?

A Yes.

Q Okay.

A As I recall, the response -- this response to D of A is basically saying, "We attempted on more than one occasion to get a pay increase for Ms. Potter," which they -- they lowered or denied; and now, they are pointing this out to us.

Q So, D of A identified this as an issue?

MS. O'KEEFE: Object to form.

If you know, you can answer.

THE WITNESS: As I recall, whatever increase we were working on, they countered and said they would not -- could not approve the increase as we requested for other employee or not as much as we'd requested; and they noted Ms. Potter's pay. That is hot I recall it. Rikki might be able to answer better.

MR. MITCHELL: And that's fine.

THE WITNESS: This is just really my wordsmithing and what I compiled or comprised.

BY MR. MITCHELL: